Whitaker, Judge,
delivered the opinion of the court:
The plaintiffs in these actions sue for that part of the cargo on board the steamer John Lyhes belonging to each of them, which was unloaded at Cebu, Philippine Islands, in December 1941, and which they allege was taken by defendant.
The John Lyhes sailed from San Francisco on November 10, 1941, bound for Shanghai and Manila, in that order. For some unexplained reason the vessel did not stop at Shanghai, but proceeded on to Manila, arriving there on December 4, 1941. Some cargo was discharged there, but, due to a shortage of pier and warehouse facilities, further discharge was ordered by the port authorities to be discon *350 tinued and the vessel was ordered to proceed to Cebu and to discharge there the cargo destined for Shanghai.
The vessel arrived at Cebu on December 7, and between that date and December 12 discharged all her cargo destined for Shanghai except a small amount which was underneath the Manila cargo. On December 13 the Philippine Collector of Customs ordered the John Lyhes to discharge the remainder of her cargo at Cebu, and this was done between that date and December 19.
On December 9 Colonel Cook, the Commanding Officer of the Advanced Quartermaster depot at Cebu, directed the agent of Lykes Brothers Steamship Company, which owned the steamer John Lyhes, to hold the cargo subject to Army control, and ordered him not to dispose of it without authority from him.
There was insufficient space on the piers at Cebu to store all the cargo unloaded, and for this reason, among others, Colonel Cook and the agent of Lykes Brothers leased all available shelter for the cargo, such as empty warehouses, schools and residences, to which the cargo was removed in Army trucks, which were the only trucks available.
With the exception of foodstuffs in the cargo, no inventory was made of the cargo removed to the places leased, nor was it segregated according to type. An inventory was made of the foodstuffs and these items were retained by the Army for its own use.
On December 21 Colonel Cook installed new locks on the doors of the structures where the cargo was stored and denied the agent of Lykes Brothers free access thereto. He advised the agent that he was taking physical control of the cargo, but he did permit local consignees to remove the parts of the cargo which had been consigned to them.
Although Colonel Cook took physical control of the cargo and denied plaintiff’s agent access thereto, he did not intend to requisition the entire cargo, but only to conserve it so that such parts of it as were of military use would be available when needed. At the time he did not know the contents of the cargo, except that he did know that some of it contained items of military value, such as food, clothing, medicines, motorcycles, and refrigerators.
*351 Subsequently, Colonel Cook removed from the places of storage such parts of the cargo as were of military use and appropriated them to the use of the defendant. These items consisted of food, medicines, soap, radios, motorcycles, tobacco, clothing, shoes, refrigerators, alcoholic spirits, and building materials. The balance of the cargo he left in the places where they had been stored under his direction and the direction of the agent of Lykes Brothers.
Included in the cargo of the John Lyhes were soap and soap flakes belonging to the plaintiff Colgate-Palmolive-Peet Company. These were appropriated for use by the Army prior to April 10, 1942. Also included in the cargo were 72 bales of cotton consigned by Anderson, Clayton & Company, of Los Angeles, California, to Anderson, Clayton & Company at Shanghai. The defendant had no use for this cotton and did not remove it from the places where the cargo had been originally stored and did not appropriate it to its own use.
On April 9, 1942, Colonel Cook received word that the Japanese forces were in the vicinity of Cebu. They landed on the island of Cebu at 6 a. m. the following day. After having received this word, Colonel Cook opened the places where the cargo was stored and permitted the natives to remove any part thereof which they desired. At 5:15 a. m. on April 10, 1945, forty-five minutes before the Japanese landed on Cebu, Colonel Cook ordered the destruction of all property which was of possible military value to the enemy, including the cargo of the John Lyhes which had not been appropriated by the Army.
The principles governing this case are the same as those in the case of Caltex (Philippines), Inc. v. United States, No. 48322, this day decided.
1. Defendant is not liable for the destruction of the cargo to prevent its falling into the hands of the enemy.
2. Colonel Cook did not appropriate to the use of the Army any part of the cargo of the John Lyhes which was of no military use. The control exercised by him over the cargo was merely to prevent the dispersal of these products before he had had an opportunity to determine which, if any, were of any use to him in his supply operations. It is true that *352 in doing so, Colonel Cook went to the extent of assuming physical control over the entire cargo and of excluding the agent of the steamship company from access thereto; but, even so, this did not amount to a taking of this cargo for public use. It was not a requisition of it for which the defendant is obliged to pay just compensation, but rather the exercise of reasonable control, under the circumstances, over the products.
Such parts thereof as were of military use Colonel Cook did subsequently in fact appropriate, and under all the circumstances of this case we think there arises an implied promise on the part of defendant to pay for it, since Colonel Cook was given authority to acquire by purchase such materials as were of military value. It is not shown, nor is it asserted, that the owners of the cargo or the master of the vessel were unwilling to turn these articles over to the Army; they acquiesced in the appropriation of them by Colonel Cook. From these circumstances we think an implied contract arose to pay for the articles so appropriated.
3. Colonel Cook is not shown to have had any authority to requisition property, that is to say, to take it for public use, against the will of the owner. The necessity for such authority has been discussed in Caltex (Philippines), Inc., v. United States, supra, and will not be repeated here. Neither express authority, nor authority arising from the exigencies of the case, is shown.
We, therefore, hold that the defendant is liable for all parts of the cargo which it in fact appropriated to its own use, but it is not liable for that part which it did not appropriate to its own use and which was either destroyed when it was in imminent danger of capture by the enemy forces, or which was taken by the native population, with Colonel Cook:s permission, when it was in imminent danger of capture by enemy forces.
Plaintiff, Anderson, Clayton & Company, Inc., is not entitled to recover and its petition is dismissed. Plaintiff, Colgate-Palmolive-Peet Company is entitled to recover. Since the cases have been submitted to the court on the question of liability only, judgment is suspended in the case of Colgate-Palmolive-Peet Company until the incoming of *353 a stipulation by the parties, or, in the absence thereof, until the incoming of a report of a commissioner showing the amount due, computed in conformity'with this opinion.
It is so ordered.
Laramoeb, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of-counsel, makes findings of fact as follows:
1. The J ohn Lykes was an American-flag vessel owned and operated by the Lykes Brothers Steamship Company. It loaded cargo at New Orleans, Los Angeles, and San Francisco, and sailed from San Francisco on or about November 10, 19él, destined for Shanghai, China, and Manila, Philippine Islands, in that order.
2. On December 4,1941, the J ohn Lykes arrived at Manila and there unloaded certain cargo destined for Manila consignees. There is a lack of competent evidence as to whether the change in itinerary en route, which caused the vessel to stop at Manila first instead of Shanghai as scheduled, was due to orders from the United States Navy or the personal election of the master of the vessel or its owners under the following provision of the bill of lading:
In any situation whatsoever or wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the carrier or master is likely to give rise to capture, seizure, detention, damage, delay or disadvantage to or loss of the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to proceed on or continue the voyage or to enter or discharge the goods at the port of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge or the usual place of discharge in such port the master, whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the usual place of discharge therein or attempting to discharge the goods there, may, without giving any prior notice, *354 discharge the goods into depot, lazaretto, craft, or other place and the goods shall be liable for any extra expense thereby incurred; or the master may proceed or return, directly or indirectly, to or stop at such other port or place whatsoever as he or the carrier may consider safe or advisable under the circumstances, and discharge the goods or any part thereof there without giving any prior notice, and when landed as hereinabove provided, the goods shall be at their own risk and expense, the delivery thereof by the carrier shall be considered complete and the carrier shall be freed from any further responsibility m respect thereof except to mail notice of the disposition of the goods directed to the shipper or consignee named in this bill of lading at such address as may be stated herein; or the master may retain the cargo on board until the return trip or until such time as he or the carrier thinks advisable; or the master may forward the goods by any means by water or by land, or by both such means, at the risk and expense of the goods. For any services rendered to the goods as hereinabove provided, the carrier shall be entitled to a reasonable extra compensation.
3. Because of a shortage of pier and warehouse facilities at Manila, on December 6,1941, the master of the John Lyhes was ordered by defendant’s representative to discontinue discharging cargo at Manila and to proceed to Cebu, Philippine Islands, and there discharge the cargo destined for Shanghai.
4. The John Lyhes sailed from Manila on December 6, 1941, and the following day arrived at the Advanced Quartermaster Depot at Cebu (hereafter Cebu Depot), about 350 miles south of Manila, where all Shanghai cargo was discharged between December 7 and December 12, with the exception of a small amount in Number 1 hold which, was underneath Manila cargo. She then moved out into the stream awaiting orders to return to Manila to discharge her Manila cargo there.
5. On December 9, Colonel Cook, the Commanding Officer of the Cebu Depot, advised the agent for Lykes Brothers in Cebu that the cargo from the John Lyhes was to be held under Army control, and not to be disposed of without authority from him or his representative. In making this statement he did not intend to assume ownership of any part of the cargo, but only to take steps to see that it was not dis *355 persed until he had an opportunity to examine it and learn whether it contained anything that could be useful to him in his supply operations. Colonel Cook leased additional warehouse and other storage space in Cebu and vicinity that had been located with the help of the agent of Lykes Brothers. In moving the cargo to warehouses (Finding 8, infra) it was not separated according to type and that which had a potential military use was not segregated, except that all items identifiable as foodstuffs were moved to a warehouse which had been rented by the Army and were inventoried and retained permanently by the Army. The balance of the cargo that was warehoused was not inventoried. The inventory of the foodstuffs was later destroyed.
6. On December 13, 1941, the master of the John lyhes received the following letter from the Philippine Customs Authority:

Burean of Customs

CEBU

CONFIDENTIAL December 13,1941
The Master
S/S John Lyhes
Port of Cebu
Dear Sir:
For your information and guidance, I have to quote hereunder a portion of the message from the U. S. Navy, Cavite, which affects your vessel. “DIRECT JOHN LYKES UNLOAD MANILA CARGO AT CEBU, IS[1] ABLE WORK NIGHT OVERTIME THEN PROCEED RIGHT VIA MAKASSAR STRAIT TO PORT DARWIN. IF NECESSARY REPLENISH BUNKERS AT BALIKAPAPAN.”
Please be guided accordingly.
Respectfully.
(Signed) Melecio Fabkos,

Collector of Customs.

7. Between December 13 and December 19, 1941, all the remaining cargo on board the John Lyhes, including that destined for Manila, was discharged at Cebu. The vessel left Cebu free of its cargo on December 19,1941.
*356 8. There was insufficient storage space on the piers in Cebu and Colonel Cook and the agent for Lykes Brothers, as stated, leased all the available shelter they could locate, such as warehouses, empty schools and residences, and removed to them the cargo in Army trucks, which were the only trucks then available in Cebu. This was done in order to clear the piers to make them available for other anticipated shipments and to disperse the material so as to minimize the effects of expected enemy bombing. Except for a few pieces of heavy machinery which were left on the pier, all of the cargo of the John Lykes unloaded onto the pier was removed to places of storage.
9. On December 24 Colonel Cook advised the local agent for Lykes Brothers that he was taking physical control of the cargo from the John Lykes. Thereafter, he installed new locks on the doors of the structures where the cargo was stored and denied the agent free access to the stored cargo. He permitted certain local consignees to remove parts of the cargo consigned to them. At this time.Colonel Cook did not have an inventory of the cargo (except the manifest which apparently he had not examined, and the foodstuffs inventory which was later destroyed) or know its full contents, although he knew that it included some items of military use, such as food, clothing, medicines, motorcycles and refrigerators. In taking physical control of the cargo Colonel Cook announced to the agent his intention to give receipts, but'this was never accomplished. His intention was to conserve th& cargo so that such of it as would be useful to satisfy military or civilian requirements, which were within his responsibilities to provide, would be available when needed.
10. Following December 24 Colonel Cook actually appropriated certain items from the cargo of the J ohm, Lykes which were needed in his supply operations, removed those items from their places of storage, and distributed them to the troops and civilian population. The items which he so appropriated were food items (other than dog food), medicines, radios, motorcycles, tobacco, building materials, clothing, shoes, refrigerators, and spirits (other than wine). He included in this category of items those taken off by the native population at his instructions on April 9, 1942, when the *357 warehouses were opened for that purpose (Finding 11, infra).
11. On April 9,1942, Colonel Cook received word that the Japanese enemy forces were approaching Cebu. He accordingly directed that the warehouses and other places of storage under his control which held clothing and foodstuffs be opened to the natives so they could take what they wanted. There had been no local looting of property in the Cebu area up to April 9,1942. At 5:15 a. m., April 10,1942, at a time when he was out of touch with higher authority, Colonel Cook directed the destruction of the warehouses and other storage centers at Cebu, together with cargoes discharged from vessels and many fixed and floating facilities which might have been of military value to the enemy. The demolition was carried out and the Japanese invaded Cebu at 6 a. m., on that day.
12. a. On July 27,1941, the command known as USAFFE (United States Armed Forces in the Far East) was created and General Douglas MacArthur was placed in command. The Philippine Department, United States Army, was continued in the echelon of command under Headquarters, USAFFE.
5. General Charles C. Drake, who had theretofore been Department Quartermaster, Philippine Department, was assigned as Chief Quartermaster, USAFFE, on July 28, 1941, and continued to discharge the duties of both offices until approximately October 25, 1941. On or about the latter date he was relieved as Department Quartermaster, Philippine Department, and succeeded by Colonel Brezina, who remained in the assignment or its equivalent until the removal of the forces to Bataan on or about December 24,1941. The Chief Quartermaster, USAFFE, had no quartermaster command duties to perform, but as a staff officer of USAFFE he prepared orders relating to procurement, supply and transportation which were issued by the Adjutant General, USAFFE, in the name of, and by command of, General MacArthur for administration and execution by the Philippine Department and its successor command.
c. In November 1941 the Philippine Department was absorbed in the USAFFE Field Service Command, which was *358 thereafter sometimes referred to as the Philippine Department Service Command. General MacArthur retained command of the Philippine Department Service Command as well as USAFFE. The order establishing the USAFFE Field Service Command and defining its functions was vague in defining and limiting the duties of control, administration, operation and maintenance to the various echelons of command, and caused some confusion in the minds of the officers charged with the duties above mentioned. In general, the USAFFE Field Service Command had no tactical control, but was charged with the administration and operation of supply and maintenance facilities of the supply services and the command of personnel and troops assigned to them. Headquarters, USAFFE, through its Chief Quartermaster, was charged with control of these facilities, including staff supervision and inspection. From the formation of the USAFFE Field Service Command until its removal to Bataan on or about December 24,1941, all directions dealing with the control and supervision of all quartermaster facilities in the Philippines, including the Cebu Depot, proceeded from the Chief Quartermaster, USAFFE, through the Department Quartermaster, USAFFE Field Service Command. Thereafter such duties as the latter had in connection with the operation and administration of the depot at Cebu were taken over by the Chief Quartermaster, USAFFE.
13. In October 1941, when USAFFE decided to expand its supply facilities to provide subsistence, clothing and equipage for the Philippine Army then being mobilized in the southern islands, it was decided that Advanced Quartermaster Depots should be opened at Cebu and at other strategic locations in the Philippines. The Cebu Depot was established November 25, 1941, but did not commence functioning until sometime after December 5, 1941. Its initial missions were (1) to furnish supplies to all troops in the Visayan-Mindanao area; (2) to stock a six-months’ supply of all items, except subsistence; and (3) to procure subsistence supplies locally for all troops in the area.
14. The facts of record bearing on Colonel Cook’s official authority to take over the cargo of the John LyJces are con *359 tradictory and confusing. Army regulations, whicli may have provided a helpful clue, are not in evidence. Reconciling the numerous inconsistencies in the testimony and giving full weight to those few areas in which the experts agreed, the following facts emerge:
a. In his original orders assigning him to command the Cebu Depot, Colonel Cook, in order to accomplish the missions of his command described in Finding 13, supra, was authorized to procure locally in Cebu as many supplies as were available there that he needed and to requisition the balance from the quartermaster depot in Manila, using his own discretion as to the supplies to be procured locally and to the method of their procurement. As it turned out, the Cebu Depot received no supplies from Manila. The bulk of supplies dispatched by ship from Manila to Cebu were sunk by a mine on December 16,1941.
b. Prior to December 8, 1941 (Manila time), when the Japanese attacked Pearl Harbor, no specific authority to make wartime requisitions of private property had been delegated by General MacArthur to any officer under his command. At no time prior to December 8 or thereafter did Colonel Cook request or receive from his superiors specific authority to seize private property, unless it can be interpreted as being implicit in his original orders.
g. On or about December 10,1941, the power so to requisition private property from an unwilling owner was delegated by General MacArthur to General Drake, the Chief Quartermaster, USAFFE, to be exercised by or under the authority of the latter’s executive officer. This was in the form of a mimeographed order, issued by General MacArthur, a copy of which was to be authenticated and issued with each use. No such authorization was ever issued to Colonel Cook.
d. While an emergency existed in Cebu in December 1941, there was then no immediate danger in that locality of an enemy invasion. Telephone communications between the Cebu Depot, USAFFE Pleadquarters in Manila, and the USAFFE Field Service. Command in Manila were intact up until the evacuation of Manila on December 24. Thereafter, up until the invasion of Cebu on April 10, 1942, the *360 Cebu Depot and USAFFE Headquarters on Corregidor were in frequent communication by radio and air messenger service
e. Colonel Cook appointed officers under Mm to command several procurement districts and so-called “navigation heads,” and gave them directions in the local procurement of supplies. The directions given made no mention of procurement by seizure or commandeering of private property, but contemplated contracts and purchases with funds made available for that purpose to be expended by the commanding officers of the procurement districts whom he had also appointed as finance officers to enable them to carry out their duties.
/. On December 15, 1941, the commanding officer of another Advanced Quartermaster Depot at Tarlac, which had been established simultaneously with the Cebu Depot as part of the same overall plan of quartermaster supply, was prohibited by the executive officer of the Chief Quartermaster, USAFFE, from seizing from warehouses for military use a quantity of foodstuffs belonging to Japanese merchants.
g. On or about December 15, 1941, General Sharpe, the Commanding General of the Visayan-Mindanao forces (which embraced the geographical area of Cebu), directed Colonel Cook to requisition the cargo of the John Lykes, but General Sharpe had no command relationship over the Cebu Depot, which was directly under USAFFE, and Colonel Cook did not recognize his authority to issue such orders. Nor had the power to requisition private property been delegated General Sharpe by higher authority.
15. The evidence is piecemeal as to the nature of the emergency in Cebu during this period. The following facts reflect primarily on circumstances in the Manila area:
In the fall of 1941 there was a feeling of war emergency in the air in the Philippines. On or about November 24, 1941, the troops commanding the harbor defenses of Manila and Subic Bays were placed on a one hundred percent wartime alert basis. On December 1, 1941, General MacArthur was warned by the War Department of a possible break with Japan and was ordered to prepare for that eventuality. All *361 USAFFE troops not already alerted were alerted immediately and moved to pre-allotted positions in observation and readiness throughout the Philippines. On December 8, 1941, at 8:30 a. m. (Manila time), General MacArthur received word of the attack on Pearl Harbor and ordered all troops to battle stations. That day was “M-Day” or “emergency day,” as the term was used in the plan which had been devised for the defense of the Philippines. Bombing of military objectives by the enemy commenced almost immediately. Enemy landings on Luzon commenced December 10. On that day General MacArthur was given carte blanche authority to commission both civilian and military individuals as temporary officers in the United States Army. Sometime in December prior to the evacuation of Manila on December 24, the commanding officer of the quartermaster depot in Manila was instructed to take charge of all supplies of any military value in the Manila Port Terminal area, including supplies in the warehouses, on docks and piers, and in vessels in the harbor. For the supplies thus taken over he was to sign receipts. During the same approximate period under the chaotic conditions that prevailed, there occurred many unauthorized seizures and hijackings of motor vehicles by American military units from the Army motor pools, and seizures of motor vehicles from private owners seem to have been sanctioned to some extent by G-4, USAFFE, on December 14, 1941, and again on December 23. The discipline and control of the troops and their compliance with orders during December 1941 was sadly deficient. There had been an enemy air strafing attack on oil installations in Cebu early in December 1941, and a bomb was dropped in the City of Cebu at some unstated time, but organized enemy bombing of Cebu did not occur until April 12,1942.
16. Up until December 24, Colonel Cook made daily “strength returns” of the forces in the Visayan-Mindanao area by telephone to the Quartermaster of the USAFFE Field Service Command in Manila. On December 24 the latter instructed Colonel Cook that further reports were unnecessary, that the Manila Depot was folding up and *362 would not be able to provide supplies for the Cebu Depot, and that thereafter Colonel Cook was “on Ms own.” The extent of authority of the Quartermaster, USAFFE Field Service Command, to give the last instruction to Colonel Cook or precisely what he meant is not made clear by the evidence.
17. On December 25 Colonel Cook was informed of a communication from General MacArthur to the effect that Manila was to be declared an open city and that the American military forces in the south (which included those on Cebu) would be “on their own.”
18. Following December 24, when USAFFE Headquarters evacuated Manila to Corregidor and the USAFFE Field Service Command evacuated Manila to Bataan, the Cebu Depot was called upon to supply the Corregidor-Bataan troops. The Cebu Depot let contracts for the local manufacture of certain items, principally wearing apparel, and many of these, together with locally-purchased apparel and foodstuffs, were shipped to the besieged forces but failed to pierce the enemy blockade.
19. On February 12, 1942, the Cebu Depot was opened as a principal receiving and shipping port for the handling of supplies for USAFFE shipped in from Australia, and Colonel Cook was appointed Port Commander. Several large freighters arriving there in February and March 1942 were unloaded.
20. Included in the cargo on the John Lyhes were 72 bales of cotton consigned by Anderson, Clayton & Co., Los Angeles (a California corporation wholly owned by Anderson, Clayton & Co., a Texas joint stock association), to Anderson, Clayton & Co., Shanghai (a branch of the Texas joint stock association). On July 31, 1943, the Texas joint stock association was liquidated through merger with its parent, Anderson, Clayton & Co. (a Delaware corporation). Through this merger the California corporation became a wholly owned subsidiary of the Delaware corporation. On September 30, 1943, the California corporation was liquidated through merger with the Delaware corporation, the present plaintiff.
*363 21. The Army bad no use for bales of cotton, and this material was presumably destroyed on April 10,1942.
22. On or about September 19,1942, the Export Insurance Company paid Anderson, Clayton & Co., the sum of $7,135 on account of said cotton, subject to the terms of an agreement signed by Anderson, Clayton & Co., reading as follows:
Supplementing the subrogation receipt executed by the undersigned with respect to the shipment described below, and in further consideration of the payment made by the Export Insurance Company and acknowledged in the said subrogation receipt, the undersigned agrees that the said payment is made and received on the assumption that the property described below was lost while insured under a policy issued by the said insurance company and as a result of perils insured against under the said policy; and the undersigned further agrees that if the said assumption is incorrect, and the said merchandise was [not] [2] lost while so insured, or was lost through requisition by the United States civil or military forces or as a result of some other cause not insured against by the said insurance company, the undersigned will refund to the said insurance company any amount by which the said payment exceeds the sum, if any, for which the said insurance company was liable under its policy or policies covering the said merchandise. * * *
23. Included in the material on the John LyJces were 338 packages containing toilet soap, soap flakes, etc., consigned by Colgate-Palmolive-Peet Company, a Delaware corporation, to Colgate-Palmolive-Peet Company, Manila, a branch of the Delaware corporation.
24. The Army had use for soap and soap flakes, and this material was appropriated for use by the Army prior to April 10, 1942.
25. On or about October 22,1945, the Insurance Company of North America paid Colgate-Palmolive-Peet Company *364 the sum of $3,162.02, representing the insurance on 438 boxes of toilet soap, including the 338 here involved, upon the execution by said company of an agreement reading as follows:
Supplementing the subrogation receipt executed by the undersigned with respect to the shipment described below, and in further consideration of the payment made by the North America Insurance Company and acknowledged in the said subrogation receipt, the undersigned agrees that the said payment is made and received on the assumption that the property described below was lost while insured under a policy issued by the said insurance company and as a result of perils insured against under the said policy; and the undersigned further agrees that if the said assumption is incorrect, and the said merchandise was not lost while so insured, or was lost through requisition by the United States civil or military forces or as a result of some other cause not insured against by the said insurance company, the undersigned will refund to the said insurance company any amount by which the said payment exceeds the sum, if any, for which the said insurance company was liable under its policy or policies covering the said merchandise. This agreement, however, shall not be en-forcible unless steps to enforce it are taken within three years after the termination of the present war is proclaimed.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff Colgate-Palmolive-Peet Company is entitled to recover.
The entry of judgment is suspended until the incoming of a stipulation by the parties, or, in the absence thereof, until the incoming of a report of a commissioner showing the amount due plaintiff Colgate-Palmolive-Peet Company, computed in conformity with this opinion.
Plaintiff Anderson, Clayton & Company, Inc., is not entitled to recover and its petition is dismissed.

 The parties are apparently In agreement that this was a typographical error and that the word “Is” should be read “If”.

 It is believed that the word “not’ was unintentionally omitted in the subrogation agreement. The supplemental agreement quoted in Finding 25, infra, includes the word “not” at the same point, and the sense of the agreement is not preserved if the word is excluded. Plaintiff in its comments on defendant’s requested findings of fact conceded the correctness of the supplemental agreement as quoted by defendant, although no specific mention was made of the discrepancy and it is not Known if plaintiff is aware of the discrepancy.