The CUBAN TRUCK AND EQUIPMENT COMPANY

v.

The UNITED STATES.

No. 245–57.

United States Court of Claims.
June 12, 1964.
Rehearing Denied Oct. 16, 1964.

Charles Bragman, Washington, D. C., for plaintiff. Hayes Wood, Sr., Miami, Fla., of counsel.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before JONES, Chief Judge, and LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.[1]

This is a suit by an inactive Cuban corporation[2] to recover for an alleged taking of its property in Germany by the Department of the Army. Recovery is premised, basically, on two theories: (i) just compensation under the Fifth Amendment[3] and (ii) compensation under Article 331 of the Rules of Land Warfare.[4]

Following World War II the United States Army assembled at 14 storage areas in western Germany and France a large quantity of used military vehicles, which in 1948 were transferred to the German Government for a fraction of their acquisition cost. In turn, the German Government conveyed title to the vehicles to a quasi-public German corporation organized in 1946, Staatliche Erfassunge Gesellschaft (STEG). Many of the trucks were sold in the period from 1948 through 1950, mostly for export to foreign destinations such as Indochina, Singapore, South America and Cuba. In February 1950 STEG entered into a "global contract" with one George Dawson whereby it sold all the remaining stocks of trucks, located at six storage areas. In the meantime, a private German corporation by the name of Trucks & Spares was organized, and in September 1950 STEG, Dawson and Trucks & Spares entered into a tripartite agreement which had the effect of transferring Dawson's rights under the global agreement to Trucks & Spares.[5]

At the instance of the European Command of the United States Army (EUCOM), the United States High Commissioner for Germany (HICOG), in September 1950, requested the German Government[6] to direct STEG to "freeze" (i. e., suspend the sale of) surplus vehicles in its possession so as to supply EUCOM's needs. The German Government honored the request and, as a consequence, the Army screened and re-

1. At the request of the court, Trial Commissioner C. Murray Bernhardt prepared an opinion which has been of very material assistance.

2. Apart from the fact that the corporation is inactive, the stockholders (all American citizens) claim to have effected a "de facto" dissolution on the eve of the concluding trial session. That measure was apparently undertaken for the purpose of avoiding the issue of "reciprocity" under 28 U.S.C. § 2502, by attempting to substitute American citizens for the Cuban corporation. Section 2502 provides:
"Citizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the Court of Claims if the subject matter of the suit is otherwise within such court's jurisdiction."
Because of our disposition of the cause on other grounds, we do not touch the question of the standing of this Cuban corporation, in the light of current happenings, to sue in this court.

3. Plaintiff also invokes "implied contract." "But whether the theory of * * * [the suit] be that there was a taking under the Fifth Amendment, * * * or that there was an implied promise by the Government to pay for it, is immaterial. In either event, the claim traces back to the prohibition of the Fifth Amendment, 'nor shall private property be taken for public use, without just compensation.'" United States v. Dickinson, 331 U.S. 745, 748, 67 S.Ct. 1382, 1384, 91 L.Ed. 1789 (1947).

4. War Department Field Manual 27–10 (1940), as amended, Nov. 15, 1944. The text of the regulation is set forth, infra, in Part I of this opinion.

5. The terms of the global contract are set forth in finding 6.

6. The German Federal Republic had been set up by that time.

moved a large proportion of the automotive equipment in STEG's possession.

This was the situation in December 1950 when Autos Carretera Central S.A. of Cuba (Carretera) expressed an interest in buying from plaintiff a quantity of Dodge cargo trucks and Chevrolet telephone construction trucks. Plaintiff's principal business was the purchase, sale and rental of automobiles, trucks and automotive equipment. Lewis Kane was at this time plaintiff's purchasing agent. Kane knew of the surplus trucks available from STEG in Germany and went there in December 1950 to find the equipment wanted by Autos Carretera. At the instruction of Trucks & Spares, Kane inspected a large group of surplus trucks in storage at STEG's depot at Kitzingen in Germany. There is evidence that during the month of December (on or about the 21st), Kane visited Kitzingen and made a list of some of the vehicles now involved, in addition to others with which we are not concerned.[7] Kane then returned immediately to Cuba. On January 2, 1951, Carretera contracted in writing to purchase from plaintiff 60 Dodge trucks and 25 Chevrolet telephone construction trucks.

Kane came back to Germany on January 9, 1951, and on January 20, 1951 entered into a contract with Trucks & Spares on behalf of the plaintiff to purchase, inter alia, 82 Dodge 1½ ton 6 x 6 military type trucks and 25 Chevrolet 1½ ton trucks at $200 each. The contract called for payment by plaintiff as soon as an export permit was obtained. On March 7, 1951, such a permit was issued, authorizing shipment to Cuba of the trucks which were the subject of the contract. On March 12, 1951, plaintiff paid in full for the 82 Dodge trucks by separate checks of $1,640 to Trucks & Spares and $14,760 to STEG, and was given a receipt by Trucks & Spares. On the same day plaintiff paid Trucks &

Spares $100 by check and was given a receipt showing its acceptance as a downpayment on the 25 Chevrolet trucks (and 80 GMC trucks, not involved in this proceeding). Also on March 12, 1951, Trucks & Spares gave Kane a receipt for $3,000 as a further deposit on 25 Chevrolet telephone construction trucks under the January 20 contract.

In the meantime the Army asked HICOG to ascertain whether there were any economically reparable trucks left in the remaining STEG stocks, and if so to "freeze" them for screening so that a selection might be made to meet the requirements of the Army. Consequently, on March 17, 1951, STEG imposed a second "freeze" on all of its remaining equipment—at the formal request of HICOG. The freeze was voluntary on the part of the German Government and no compulsion was exercised by HICOG, or so the parties agree. STEG froze its stock solely on orders from its German superiors, and not as an agent of the American authorities. STEG was, however, given a promise by HICOG that it would be reimbursed for any claims which it might have to pay third parties who had already purchased but had not secured delivery of surplus trucks taken in the second freeze.

A team of Army representatives screened all of the surplus trucks in the various STEG depots. In the course of a survey of the vehicles at the Kitzingen depot ending April 5, 1951, the survey team picked out all vehicles of certain types which were wanted, regardless of their condition, with the intention of removing all such vehicles to rebuilding plants for disassembly and restoration and "cannibalizing" unusable vehicles for parts to install in others. After the vehicles had been selected by the survey team, plaintiff submitted its list of choices to the German sellers.[8] It was then informed that 81 of the 82 Dodge trucks

7. Whether this list was given to Trucks & Spares is sharply controverted and is decisive of the question of passage of title (ownership being important in a "taking" case). The facts on this point are more fully discussed, infra, in Part II of this opinion.

8. Whether this was the first time or the second time plaintiff submitted a list of

and all 25 of the Chevrolet trucks at Kitzingen depot had been selected by the Army. On April 19 the German authorities released the freeze on all vehicles, at the various depots, which the Army had not marked. STEG was instructed on the latter date by the German Ministry of Economics to hold the vehicles selected by the Army and to deliver them to the Army on request. The German authorities took the position at the time that for practical political reasons they could do nothing but obey the requests of the American authorities with respect to the trucks selected.

When Kane first learned of the second freeze in late March 1951 he wired protests to all agencies involved and announced his intention to remove the trucks which plaintiff claimed to own. The German authorities expressed their regrets to plaintiff on April 3, 1951, and stated that the freeze had been imposed at the "direction of the Allied High Commander." When Kane appeared at the Kitzingen depot on April 3, 1951, ostensibly to demand delivery of the trucks, he was told by STEG personnel in charge that he could not remove the trucks because of the freeze. On May 4 HICOG informed plaintiff that the 81 Dodge trucks were to be reacquired by the Army; on May 7 STEG notified plaintiff that the 25 Chevrolet trucks were to be reacquired; and on May 13 HICOG advised plaintiff that the 25 Chevrolet trucks and 81 of the 82 Dodge trucks were to be reacquired. On May 24, 1951, plaintiff submitted to EUCOM invoices for the seized vehicles totaling $238,090. On June 11, 1951, plaintiff augmented its invoices with certain doc-

uments purporting to evidence its ownership of the trucks and demanded payment for them.

Until August 2, 1951 the trucks remained physically at the Kitzingen depot under the control of STEG personnel who were holding them until the Army called for them. From August 2, 1951 to January 1952 the Army removed the trucks, by installments, from the depot to rebuilding centers. For several years thereafter the plaintiff carried on protracted settlement negotiations with defendant's officials and German authorities. These negotiations were still in progress when plaintiff filed its petition in this court on May 27, 1957, to recover for the 81 Dodges and 25 Chevrolets repossessed by the United States.

I

■ Defendant objects that the running of the six-year statute of limitations prevents plaintiff from maintaining its cause.[9] If the case be viewed as a claim for a taking under the Just Compensation Clause, the success of this challenge depends upon the time the Army appropriated the trucks; that is when the cause of action, if any, would first have accrued. See, e. g., Stafford Ordnance Corp. v. United States, 108 F. Supp. 378, 381, 123 Ct.Cl. 787, 793 (1953). See, also, Soriano v. United States, 352 U.S. 270, 272, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957). For such an appropriation, neither actual *physical* control or custody by the Government (see Anderson, Clayton & Co. v. United States, 122 F.Supp. 835, 129 Ct.Cl. 347 (1954)[10]) nor the absence of such fac-

the trucks to the German sellers is, as pointed out in footnote 7, *supra*, critical for this case.

9. In pertinent part, 28 U.S.C. § 2501 reads:
"Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.
\* \* \* \* \*
"A petition on the claim of a person under legal disability or beyond the seas

at the time the claim accrues may be filed within three years after the disability ceases."

10. An Army officer took physical control of the entire cargo of a ship, a part of which belonged to plaintiffs, and he denied plaintiffs' agents access. The intention of the officer was to conserve the cargo so that parts of it would be available for military use. There was held to be no taking except for the goods actually selected.

tors (see, e. g., Societe Cotonniere Du Tonkin v. United States, 171 F.Supp. 951, 959, 145 Ct.Cl. 426, 441 (1959), cert. denied, 361 U.S. 965, 80 S.Ct. 594, 4 L. Ed.2d 545 (1960); Matthews v. United States, 87 Ct.Cl. 662, 714 (1938); [11] cf. Todd v. United States, 292 F.2d 841, 155 Ct.Cl. 87 (1961)) is necessarily conclusive. The guiding questions which must be asked are: (a) Has the Government acquired effective control over the property which it seeks to utilize for a public purpose? [12] (b) If so, when was the extent of the taking, or the kind and quantity of the property appropriated, determined or determinable? See, e. g., United States v. Dickinson, 331 U.S. 745, 749, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947).

■ Assuming (but not deciding) that the defendant would be liable if suit were timely brought for taking the trucks, we start our analysis of the limitations problem, under these general principles, with the time of the so-called second freeze. At the request of the United States, the German Federal Ministry of Economics, on March 17, 1951, directed STEG to immediately exclude from sale or delivery the "U.S. goods" [13] at its depots. This freeze, the parties agree, was not itself a taking, but solely a means of conserving property until a selection could be made. Cf. Anderson, Clayton & Co. v. United States, supra. An Army survey team from Washington later came to screen the equipment and parts at the STEG stations. On March 28th and 29th and on April 4th and 5th, the Army team listed and marked trucks and automotive equipment located at Kitzingen. HICOG, on April 18th, sent the lists of selected

items, which were the results of this survey, to the German Ministry of Economics which, in turn, instructed STEG to lift the hold-order except as to the listed items, and to keep those for delivery to the United States. Thereafter, in the latter part of the month, the Army posted a representative at Kitzingen as a property accountable officer in charge of shipping the chosen trucks to rebuilding centers. The Army, however, did not actually begin the removal of the trucks from the depot until August 1951. If the presumed taking occurred when the trucks were selected and marked by the Army, in April 1951, or when the plaintiff was told of their reacquisition (by May 13th), then plaintiff's suit (brought May 27, 1957) is barred; if, on the other hand, the taking took place only when the trucks were transported out of Kitzingen, during and after August 1951, the suit is timely.

We see no adequate reason to hold that the trucks were not appropriated until they were physically removed from Kitzingen. Once the freeze order was issued by the German Government, STEG had no option but to act according to its terms; STEG could do nothing except to hold the trucks during the freeze and, after it was lifted, deliver to the United States Army, when it called for them, those trucks which had been selected. See finding 16(e). The Army had its own representative on the spot. As a matter of fact, therefore, the United States had effective control over the trucks either in March 1951 when the freeze was imposed or in April when the earmarking was accomplished and the exact kind and quantity of the reacquired trucks became known. Cf. Anderson,

11. "A taking of property within the meaning of the Constitution may be accomplished without formally divesting the owner of title to the property or of any interest therein. It is not material whether the property is removed from the possession of the owner, or in any respect changes hands * * *."

12. Whether there is authority for the appropriation is another question. See, e. g., United States v. North American Trans.

& Trading Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935 (1920). Likewise a separate issue is whether the claimed "appropriation" constituted a compensable taking, or a taking at all.

13. This phrase meant the Army surplus goods which the United States had sold to Germany, i. e., goods of United States origin. Germany, through STEG, had title to the material.

Clayton & Co. supra; Turney v. United States, 115 F.Supp. 457, 126 Ct.Cl. 202 (1953); Etlimar Societe Anonyme of Casablanca v. United States, 106 F.Supp. 191, 123 Ct.Cl. 552 (1952). If there was any doubt of the intention of the United States to take the particular trucks which plaintiff claimed as its own, that point was clarified; prior to May 27, 1951, by letters to plaintiff from STEG and the United States authorities. On April 19th STEG wrote that the Dodge and Chevrolet trucks had fallen "under this block." Finding 17(d). HICOG, on May 4th, informed plaintiff that the Dodge trucks were to be taken (finding 18(a)) and, on May 13th, advised that the Chevrolet trucks would also be taken (finding 18(b)). Plaintiff did not question that the trucks it wanted had been appropriated by the Army; on May 24th it sent a telegram to EUCOM making a claim, in the form of an invoice, for 81 Dodge trucks and 25 Chevrolet trucks totaling $238,090.

▆ There were no further steps which would have given the Army greater control over the trucks than it had in the middle of May 1951. By that time, the precise vehicles taken were known to the Army, to STEG and the German authorities, and to plaintiff. The Army could have had them anytime it desired. Despite this, the German Government, it is said, might possibly have cancelled the freeze and gone back on its agreement with HICOG. If that government had such authority, it could take the same step so long as the trucks remained in Germany, even though in the American Army's possession. Physical possession would not give the Army greater control than it had on May 15th. We think, therefore, that the taking, if such it was, had occurred by that date and plaintiff could immediately have brought suit, claiming under the Constitution.[14] One of our holdings in the comparable case of Turney v. United States, supra, directly supports this conclusion. There, American surplus property, mistakenly including radar equipment, was sold for the benefit of the Philippine Government. The United States thereafter induced the Philippines to embargo the exportation of the property so that the buyers would be pressured into agreeing to permit the Army to take charge of the equipment. The court held (115 F.Supp. 457, 126 Ct.Cl. at 214) that a taking occurred on October 13, 1947, when an American officer and a team of enlisted men segregated the radar equipment from other goods at a depot, notwithstanding findings showing that the equipment was not shipped out until November and December 1947. 115 F.Supp. 457, 126 Ct.Cl. at 231–232.[15]

Plaintiff, suing under Article 331 of the Rules of Land Warfare as well as

---

14. Or under Article 331 of the Rules of Land Warfare (see *infra*). The same principles as to time of seizure would apply.

15. After the seizure, plaintiff negotiated with United States and German officials to recover compensation. It says that during the period of attempted administrative settlement the statute of limitations did not run. A like argument was squarely rejected by the Supreme Court in Soriano v. United States, 352 U.S. 270, 274–275, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957).

Plaintiff claims, in addition, that it was "misled" by the United States officials with whom it dealt into believing that a settlement would be achieved and, therefore, that the Government ought not be permitted to succeed on the limitations question when it was the Government which caused plaintiff to delay its suit. Plaintiff admits, however, that there is nothing in the record to show that the officials were deceitful. There is likewise nothing indicating that the officials asked that suit not be brought. Plaintiff was at all times represented by counsel. The mere continuance of negotiations, even where United States representatives express a view that a settlement is likely, constitutes no reason to extend the limitations period. This is especially so where a claimant has been adequately represented by counsel during the negotiations. When settlement talks stretched out for a long time there was nothing to prevent plaintiff's counsel from filing a protective claim in this court. *Cf.* Oakland Truck Sales, Inc. v. United States, 149 F.Supp. 902, 138 Ct.Cl. 63 (1957).

the Fifth Amendment, has a second string to its bow. It urges that Article 331 delays the emergence of the right to compensation until "peace is declared." The Article reads:

> "Private property susceptible of direct military use.—All appliances, whether on land, at sea, or in the air, adapted for the transmission of news, or for the transport of persons or things, exclusive of cases governed by naval law, depots of arms, and, generally, all kinds of ammunition of war, may be seized, even if they belong to private individuals, *but must be restored and compensation fixed when peace is declared.* * * * " [Emphasis added.]

By virtue of this regulation, plaintiff insists that it had no cause of action until President Truman (Proclamation No. 2950, 66 Stat. c3) and a Joint Resolution of Congress (65 Stat. 451 (1951)) proclaimed a termination of the state of war with Germany in October 1951.

Let us assume for this case that Article 331 applies here, and that it affords the injured individual a personal, justiciable cause of action, vindicable in this court. We also assume, again without deciding, that before "peace is declared" not only enemy aliens but also neutrals and citizens would be barred from seeking compensation, under the Article, through a suit resting on the Tucker Act. On those postulates, when could an action be instituted? The formal declaration, in October 1951, of the end of the state of war was not necessarily the only date upon which "peace is declared" within the meaning of Article 331. Laws or regulations using terms of this type must be read in the light of their special objectives and backgrounds; the end of the technical state of war is not automatically controlling. Cf. Lee v. Madigan, 358 U.S. 228, 230–231, 79 S.Ct. 276, 3 L.Ed.2d 260 (1959); Note, 47 Colum.L.Rev. 255, 268 (1947).

The regulations immediately following Article 331 (which refer to it) state:

> "332. What included in rule.— The foregoing rule includes everything susceptible of direct military use, such as * * * motors, bicycles, motorcycles, carts, wagon, carriages * * *.

> "333. Destruction of such property.—The destruction of the foregoing property and all damage to the same is justifiable if it is *required by the exigencies of the war.*" [Emphasis added.]

Articles 331–333, when read together, as they should be, indicate to our mind that delay in payment under 331 was intended to subsist, at least for non-enemies, only during the period of actual warfare, that is, when "the exigencies of war" require it. The more recent Army Field Manual (27–10) (July 1956), in Paragraph 403, the successor to Article 331, replaces the words "when peace is declared" with "when peace is made." That language is designed to mean the same as the earlier version because both regulations are derived from Article 53 of the Hague Convention of October 18, 1907, 36 Stat. 2277, 2308, which also uses the words "when peace is made." In the same context, paragraph 409 of the 1956 manual provides:

> "If property is seized * * * a receipt therefor should be given the owner * * * in order that restoration and compensation may be made *at the conclusion of the war.*" [Emphasis added.]

These latter phrases—"when peace is made" and "at the conclusion of the war"—suggest, in their setting, that the delay provision of Article 331 was inserted, not to await the formal declaration of peace, but to postpone the question of payment to the earliest practicable date after the close of the fighting, when the "exigencies of the war" would allow the seizing power to turn its consideration to the unwarlike subject of compensation. In World War II,

the cessation of hostilities was officially proclaimed by the President as of December 31, 1946, Proclamation No. 2714, 61 Stat. 1048. This seems to us the most appropriate date for the accrual of any right to compensation under Article 331 (assuming there is such a justiciable right). The fighting was over and reconstruction had begun.[16] Part of that rebuilding would include restitution for property previously taken during the hostilities. Postponement of the right until the coming of formal peace would not, so far as we can tell, serve any significant function, but would go counter to the normal principle that the right to claim compensation for a taking should be deferred no longer than necessary.

It is true that, for Germans (or Germany), there might still be bars to suit in this court under the common-law rule precluding their access to our courts, or perhaps through the vesting provisions of the Trading With the Enemy Act; others with property in Germany might also face these or similar disabilities. Cf. Farbenfabriken Bayer A.G. v. Sterling Drug, Inc., 251 F.2d 300 (C.A.3), cert. denied, 356 U.S. 957, 78 S.Ct. 994, 2 L.Ed.2d 1065 (1958). But so far as Article 331 itself was concerned, any justiciable claim for a past seizure would accrue.[17] If, as plaintiff must necessarily argue, Article 331 continued to apply until the war was wholly terminated in October 1951, seizures under that Article between January 1947 and October 1951 would become immediately compensable (even though in some instances suit could not be brought at once because the owner was "under legal disability or beyond the seas," see footnote 17).

This construction of the regulation seems to us most consonant with its terms and purpose, especially as applied to the circumstances of World War II. In plaintiff's case, postponement of limitations works in its favor. If, however, we had been faced with a claimant whose property in Germany or Japan was seized under Article 331 in 1947, 1948, or 1949 (as plaintiff says it could be), plaintiff's theory would demand that a suit in those years (or in 1950–1951) be condemned as premature, even though the owner was not otherwise disabled from litigating in this court. Such a strange rule would have had untoward consequences for the defeated countries and those dealing with them. After the cessation of hostilities, the United States endeavored more and more to foster normal trade relations with Germany (as well as Japan). Since the terms of Article 331 cover broad, general classes of property (see. also, Article 332), in adopting plaintiff's position we would be obliged to say that the United States could induce trade with Germany and Japan after 1946, and once goods of the nationals of friendly states, or even of United States citizens, reached the shores of Germany or Japan, this country could seize them and lawfully delay consideration of payment until formal peace. We need not accept that result as compelled by Article 331.

## II

Were plaintiff able to overcome the hurdle of the time-bar it would still have to prove that it owned the trucks when they were purportedly taken by

---

16. After December 31, 1946, the United States did not ordinarily vest German interests in property, under the Trading With the Enemy Act, except property which was vestable prior to that date. See Gmo. Niehaus & Co. v. United States, 170 F.Supp. 419, 145 Ct.Cl. 173 (1959); Farbenfabriken Bayer A.G. v. Sterling Drug, Inc., 251 F.2d 300, 302, 304 (C.A. 3), cert. denied, 356 U.S. 957, 78 S.Ct. 994, 2 L.Ed.2d 1065 (1958).

17. Under 28 U.S.C. § 2501, a petition in this court "on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases." See footnote 9, *supra*. Plaintiff agrees that all disability, if it had any, ceased when peace was formally declared in October 1951. It did not bring suit within three years thereafter.

defendant.[18] The parties are agreed, and we concur, that German law governs the passage of title.

■ On January 20, 1951, plaintiff and Trucks & Spares executed the formal contract for the sale of the Dodge and Chevrolet trucks. The writing contained nothing explicit as to when title was to pass.[19] For such situations, section 929 of the German Civil Code provides:

"For the transfer of ownership of a moveable it is necessary that the owner deliver the thing to the acquirer and agree with him that the ownership shall pass. If the acquirer is in possession of the thing the agreement as to the passing of ownership is sufficient."

Unless the buyer of a moveable has the property in his possession (plaintiff never did), physical delivery is ordinarily required in order for title to pass. The German sellers never attempted to deliver. In certain circumstances, however, section 930 of the Code adds a mollifying element:

"Where the owner is in possession of the thing, an agreement between him and the acquirer relating to a legal relation whereby the acquirer acquires indirect possession takes the place of delivery."

Plaintiff's position is that, if it can show that it identified the specific trucks it wished to take and that it communicated its choices to Trucks & Spares before the freeze in March 1951, it would have acquired "indirect possession" and, hence, title. Taking the law to be as plaintiff suggests, the issue is narrowed to the factual question of whether plaintiff identified to the sellers—before the freeze—the particular trucks it wanted.[20]

As we have previously stated, Kane (acting for plaintiff) did make an inspection of the trucks at Kitzingen depot in December 1950; he was accompanied by a Mr. Ringelman whom he hired for that purpose.[21] Plaintiff insists that it was then that the trucks selected for purchase were marked and listed. The evidence does indicate that a handwritten list of some kind was made, because an official of STEG confirms that in December Kane proffered to him a list of trucks. The STEG official, however, refused to accept it and told plaintiff to give it to Trucks & Spares since the latter was the party with which plaintiff was negotiating. Plaintiff does not argue that this offer of a list to the STEG official was an effective communication of its choices. Kane testified, without giving details, that he then (in December 1950) gave the list to an official of Trucks & Spares, and it is this communication upon which plaintiff relies. To the Trial Commissioner, who found for plaintiff on this point, it seemed natural to suppose that Kane, having once attempted to deliver the list to STEG, would immediately transmit it to Trucks & Spares as it was suggested he do.[22] Nevertheless, both Trucks &

18. If title had not passed to plaintiff, its claim would merely be for frustration of its contract with Trucks & Spares, not for a taking or seizure of its property. Such a claim is not cognizable in this court. Omnia Commercial Co., Inc. v. United States, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923). Plaintiff does not contend otherwise.

19. The "global" contract between STEG and Trucks & Spares did have a clause concerning passage of title. See finding 6. That provision, however, has no effect on the problem with which we are dealing. See finding 7.

20. After the freeze was instituted in March 1951, i. e., when the German Government ordered STEG not to deliver goods of United States origin, "indirect" possession could not have been acquired by plaintiff under section 930 of the Civil Code.

21. Ringelman was an employee of STEG who was then on leave. He never returned to work for STEG; he was discharged.

22. Commissioner Bernhardt did not hear the pertinent testimony and his findings do not indicate that, in finding for plaintiff, he relied heavily on the credibility of Kane's oral testimony, of itself.

Spares and STEG were unable to find such a list or a record or copy of it in their files.[23] Moreover, the written agreement between plaintiff and Trucks & Spares (executed in January 1951, one month after the alleged delivery of the list to Trucks & Spares) contained the clause that "the vehicles *will* be inspected and marked by the buyer." (Emphasis added.) The formalized agreement thus speaks of an identification to be made in the future. This raises serious doubts as to Kane's testimony. If he had given the list to Trucks & Spares in December, would he not have become alarmed when the contract recited a selection to be made in the future? To avoid losing to another buyer the right to the vehicles selected in December (presumably those which were in the best condition) it would have been natural for Kane, if he had made a definite choice one month before, to incorporate the list into the written contract, or to make sure that the seller knew the exact trucks he had chosen. The record is devoid of any evidence that Kane protested the language of the contract or that he attempted to have the list of trucks appended to, or incorporated in, the writing.

On February 9th, Trucks & Spares sent the following letter to STEG:

"With contract of January 20, 1951, we sold to the Cuban Truck & Equipment Company, Havana, Cuba, represented by Mr. KANE, the following vehicles from the Depot Kitzingen:

\* \* \* \* \* \*

"25 Chevrolets, 1½ tons, 4 x 4,

82 trucks, 1½ tons, 6 x 6, Dodge.

"We ask you to give adequate instructions to the Depot Kitzingen *so that the inspection and selection of the above-mentioned vehicles can be smoothly effected by Mr. KANE or his representatives.*"[24] [Emphasis added.]

On February 19th, STEG wrote to the Kitzingen depot:

"The firm of Trucks & Spares informs us that with contract of January 20, 1951, the following vehicles were sold from the Depot Kitzingen to the firm of Cuban Truck & Equipment Company, represented by Mr. KANE:

\* \* \* \* \* \*

"25 Chevrolets, 1½ tons, 4 x 4,

82 trucks, 1½ tons, 6 x 6, Dodge.

"We request you to send us a list in duplicate *after* the inspection and selection of the vehicles so that we can transmit a copy to the firm of Trucks & Spares. [Emphasis added.]

It is evident, if these letters are taken at face value, that both STEG and Trucks & Spares were relying on the personnel

23. The only list they had was the one given to them in April 1951, after the March freeze.

24. On February 9th, Trucks & Spares also certified that there was no restriction in the nature of U.S. Army requirements or prior private sales to prevent the sale of 82 Dodge and 25 Chevrolet trucks to plaintiff. This certification was made in order to obtain export clearance from the German Government for the trucks. The trucks were not listed by serial number; summary descriptions of "25 Stock Chevrolets" and "82 Stock Trucks 1½ Ton, Dodge," were used. Finding 13(b) gives the text of the certification. This does not show whether the particular trucks plaintiff claims to have selected were known to Trucks & Spares. But even though Trucks & Spares did not know what trucks plaintiff had selected, we think it could still know that there was no existing restriction on them. It is possible that no Army-earmarked trucks (presumably marked during an earlier freeze) remained at Kitzingen on February 9th; therefore, Trucks & Spares could (without actual knowledge of plaintiff's choice) honestly certify that there was no restriction. The same may be said for prior sales. Another explanation could be that its Kitzingen stock was so large that Trucks & Spares could meet the requirements of plaintiff's contract, as well as other requirements which might have existed at the time. One witness testified that in 1951 over 2,000 vehicles were at Kitzingen depot. Tr. 378.

at Kitzingen to inform them of the trucks Kane selected, if and when he made a selection.

Nearly one month later on March 12th, Trucks & Spares gave Mr. Kane a letter granting permission to make his selection at any of the depots:

"Referring to your conversation you had today with our Mr. Hess we confirm to you that we are willing to change our contract insofar as we will give you permission to pick out your trucks from any of our stock, located in any STEG camp."

This letter is not conclusive by itself that no prior selection had been made, but if it is taken together with the formal contract, the absence of any record of a list, and the letters of February 9th and 19th a formidable case is made that Kane never handed the list to Trucks & Spares in December 1950 as he testified he did.

There are still other circumstances. After the March freeze Kane met Ringelman at Kitzingen and received from him the handwritten list which had been prepared in December; Kane, in turn, gave it to Kitzingen personnel to copy. Prior to that time, the depot did not have a copy of the list or know which trucks had been selected. If Kane had actually marked the vehicles in December, it seems unlikely that Kitzingen would not have known about it. It is significant, also, that Kane had to go to Ringelman to obtain the list; Kane himself apparently had no copy of the single handwritten paper he had drawn up in De-

cember. The original was given to Ringelman, and Kane did not keep a copy. In those circumstances it is hard to believe that a copy (now lost) of the handwritten list was made for and given to Trucks & Spares in December.[25]

We cannot escape the conclusion that it was not until April 3rd that STEG, Trucks & Spares, or the Kitzingen complement was made aware of the selections Kane had made in December. We reconstruct the events in this way. When Kane and Ringelman inspected the trucks in that month, it was probably with the intention of making a final choice. The same intention persisted when Kane submitted the list to the STEG official. But once the list was returned to him by STEG, Kane, we infer, had some afterthoughts. There was no immediate need to turn the list over to Trucks & Spares because the contract had not yet been executed and the trucks selected could be sold to others during the interim. Besides, the inspection had been made hurriedly (in a day or a day-and-a-half) when the trucks were all covered with snow, causing difficulty in ascertaining which were the best vehicles. We judge that, with this in mind, Kane did not deliver the list to Trucks & Spares, but gave it to Ringelman so that the latter could continue with the inspection and determine what parts of the listed trucks were missing. Kane may very well have planned that, after Ringelman had made a closer inspection of the trucks (which Ringelman did in fact during the rest of De-

25. We have considered the other evidence to which plaintiff points in support of its position. The testimony of Hess (the official of Trucks & Spares to whom Kane says he gave the list in December) as to his receipt of a list is both unelaborated and equivocal; in addition, he did not recognize the handwritten list obtained from Ringelman (the one list we are sure existed). Oebel, another Trucks & Spares man, saw "Kane" markings on trucks, but his testimony did not tie these markings to the particular vehicles involved here; Kane appears to have dealt widely in trucks in Germany. Knoess, a freight handler, said he received from Kane the types and numbers of trucks to be moved, but again this part of the testimony is very general and not adequately connected to the trucks in suit. The same is true of Kane's own testimony as to "marking"; it is not always clear whether he meant "marked on the truck" or "marked down on a list," and much of his testimony on the point is general and unrelated to particular transactions.

On the other hand, the defendant finds support in Ringelman whose testimony leaves the strong inference that he kept the list made in December and did not give Kane either that list or a list of the trucks thereafter selected until April 1951.

cember), the list would be reviewed and desired changes in selection could then be made without the possible red tape which would accompany modifications if the list had already been handed to Trucks & Spares. Kane left the list with Ringelman and departed from Germany. When Kane returned to Germany in January to execute the contract, nothing in the record indicates that he saw Ringelman. Why Kane did not obtain the list from Ringelman and deliver it to the seller at that time, we cannot say for sure. Perhaps he simply forgot. More likely, however, he wondered whether a better selection could not be had at stations other than Kitzingen. On this basis, he probably wanted some more time to look around and then to obtain permission to select vehicles at the other depots. This view is supported by the letter of March 12th—just a few days prior to the freeze—giving such permission.

Whether or not we are correct in what we make of the evidence, we are convinced that, on this record, plaintiff has not carried its burden of proving that it did communicate its selection to Trucks & Spares prior to the freeze. The Trial Commissioner felt that "no reason can be surmised for a failure on his [Kane's] part to communicate the same information [as he had offered to STEG] to Trucks & Spares and to the personnel at the Kitzingen depot" and that "it is not realistic to believe that Kane would have failed to comply with such simple requirements." We have suggested reasons why Kane could very well have delayed making and communicating his final choice. In any event, we think that, on balance, the weight of the evidence does not fall on plaintiff's side. We cannot find, therefore, that the selection was ever communicated to the German sellers or that title to the trucks passed (under section 930 of the German Civil Code) to plaintiff prior to the March freeze.

For the foregoing reasons, we conclude that plaintiff is not entitled to recover. Its petition is dismissed.