**TURNEY v. UNITED STATES.**
No. 48724.

United States Court of Claims.
Sept. 30, 1953.

Thurman Arnold, Washington, D. C., for plaintiff. Reed Miller, Arnold, Fortas & Porter and Davidson & Nikoloric, Washington, D. C., were on the briefs.

Monroe Oppenheimer, Washington, D. C., for intervenors. Isadore G. Alk, Washington, D. C., was on the briefs.

Thomas O. Fleming, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The plaintiff sues for just compensation under the Fifth Amendment or, in the alternative, for damages for breach of contract. The claim arises out of the alleged taking by the Government of a large quantity of radar equipment.

Leyte Air Depot was established at Tacloban on the island of Leyte in the Philippines to support the American forces after they had landed on that island in October 1944, in the course of retaking the Philippines from the Japanese. The depot was stocked with military equipment, a portion of which was "roll-up" equipment, that is, equipment which had been at other depots and had been brought to Leyte when the other depots were closed.

On April 30, 1946, Congress enacted the Philippine Rehabilitation Act, 50 U. S.C.A.Appendix, § 1751 et seq., which, among other things, authorized the transfer to the Philippine Government of certain surplus property of the United States then located in the Philippines. On July 4, 1946, the Republic of the Philippines came into existence.

On August 28, 1946, the Pacific Air Service Command declared surplus to the Foreign Liquidation Commission certain property, which had cost the United States $5,455,423.15, and which was described as follows:

"1. a. The AAF supplies on hand at the Leyte Air Depot consist of the following categories:

"(3) That declared in bulk on SPB–3

\* \* \* \* \* \*

"2. a. \* \* \* A suitable description of this property would be as follows: 'All AAF supplies located at the Leyte Air Depot, \* \* \*'"

On September 11, 1946, the United States and the Philippine Government entered into an agreement for the transfer of the surplus property, pursuant to the Act of Congress of April 30, 1946. The property transferred the Philippines by this agreement included the Leyte Air Depot.

Paul B. Ranslow was a bombardier and Vernon E. Childers was a pilot in the Air Force during the Second World War. After their discharge from the service they went into the export-import business in China. In the summer of 1946, Ranslow, then in the Philippines, learned that certain property at the Leyte Air Depot would be sold as surplus. He asked Childers, who was in Shanghai, to contact K. H. Khoong and his son C. Y. George Khoong, residents of Hong Kong, to see if they were interested in bidding for the property. They were, and furnished most of the money for the purchase which was later made. In late August 1946, Ranslow and Childers made a bid of $400,001, for the supplies and buildings at the Leyte Air Depot. The Foreign Liquidation Commission, which was selling the property for the account of the Philippine Government, submitted this bid and two others to the President of the Philippines, who rejected all the bids because he did not want the hangars and Quonset Huts at the depot sold. On September 3, 1946, Ranslow and Childers submitted another bid in the same amount for the property and material

at the base, excepting the buildings referred to above. Their bid was the high bid, and was accepted. On September 5 a sales contract, naming the United States as the seller and Ranslow and Childers as the buyer, was made. Article 2 of the contract said:

"Article 2. The property is sold 'as is'; the United States makes no guaranty, warranty, or representation, express or implied, as to the kind, size, weight, quantity, quality, character, description, or condition of any of the property, or its fitness for any use or purpose, or otherwise, except warranty as to title; this is not a sale by sample."

On October 5, 1946, the final payment of the $400,001 was made. Ranslow and Childers had contributed $20,000 each, and the Khoongs $360,000. We are uncertain as to who contributed the odd dollar. It was agreed between them and the Khoongs that a corporation was to be formed and that Ranslow and Childers were each to receive 15% of the profits and were to manage the properties without salaries. In November 1946 Ranslow and Childers, named in the title papers as purchasers, assigned their rights and interests in the property to the corporation which was then in the process of being formed, the corporate charter being dated December 4, 1946.

Late in December 1946, classified military radar was discovered by the corporation's employees among the supplies at the depot. It had, apparently, been left at the depot by the Air Force by mistake, since on July 19, 1946, the Pacific Air Service Command had issued a directive relative to surplus declarations which said:

"(6) Under no condition will any radar equipment be declared to the disposal agency."

Neither the buyers nor those who made the sale for the Government were aware, when the sale was made, that there was radar equipment among the supplies at the depot.

Childers, who was in Shanghai, was immediately notified about the radar. He, because he could not speak Chinese, asked George Khoong to assist him in selling it to the Chinese Nationalist Air Forces. He contacted the American Military Attache's staff in Nanking and advised them that he was negotiating with the Chinese Air Forces for the sale of the radar but he wanted clearance from that staff before he sold it as he did not want to be held responsible if the radar fell into the hands of the Chinese Communists. The Military Attache notified the United States military authorities about the radar and representatives of the Air Force visited the depot and inspected the radar. A conference was held with Ranslow. He refused to allow agents of the United States to enter the depot to demilitarize the radar. He agreed to let an agent of the Air Forces return to the depot and take part in the preparation, then in progress, of an inventory of the material.

Later, the Air Force offered to exchange commercial type communications equipment for the noncommercial military radar, on a ton-for-ton basis. This offer was refused. Childers, for the corporation, offered to exchange the radar for items such as machine and hand tools except electronic equipment, which Childers might select from another depot. The Air Force refused this offer. Childers refused to allow the removal of the key components from the radar sets, which removal would have eliminated the security classification of the material, until arrangements had been made for reimbursement of the corporation.

On July 24, 1947, General Acheson, the Commanding General, 4th Air Depot, left word at Ranslow's office that the United States desired to repossess the radar, by negotiation if possible, if not, by securing the aid of the Philippine Government in seizing the radar. That aid would have been necessary because the materials were located on soil under the sovereignty of the Philippine Government, since July 4, 1946, an independ-.

ent nation. Ranslow advised General Acheson that any attempt to seize the radar would be resisted but that the corporation would resell the radar to the Government for a reasonable price. General Acheson responded that the War Department did not desire to repurchase the radar, but was only interested in reclaiming it because it had been inadvertently sold.

Mr. Abello, Chief of the Executive Offices of the President of the Philippines, became aware that the United States Army desired to repossess the radar. On July 30, 1947, he wrote the corporation asking the price at which the corporation would sell the radar materials to the Philippine Government. On the same date, at the suggestion of representatives of the United States, he placed an embargo upon the exportation from the Philippines of any of the materials at the Leyte Air Depot.

Ranslow offered to sell the radar to the Philippine Government for $100,000. Mr. Abello refused the offer, saying the price was much too high. Mr. Davis, an official of the American Embassy in Manila, advised Ranslow and Childers that if they would give written assurance that the radar would be segregated from the other material at the base, and would not be disposed of, either in or outside the Philippines, until the dispute concerning it was settled, Mr. Davis would advise Mr. Abello that the Embassy had no objection to the exportation of the materials other than the radar. Ranslow and Childers gave the written assurance, Mr. Davis transmitted it to Mr. Abello, and on September 3 the embargo was lifted, as to the material other than the radar.

On August 30, Mr. Abello, Mr. Davis, and General Eubank of the United States Army agreed that an officer or enlisted man of the Army would be designated who should act as an agent of the Philippine Government in supervising the segregation and security of the radar. It is probable that at some time in September, one or more members of a Graves Registration Unit of the Army were at the depot performing that function. By orders dated October 10, 1947, Captain Royce was ordered to proceed to the depot on or about October 13. He did so, with a team of enlisted men who segregated the radar. On November 11, 1947, Captain Royce and the corporation made a written agreement that the radar equipment at the depot would be returned to the United States Government and that a full receipt for the material would be given to the corporation. The corporation stated in the agreement that it intended to make a claim against the Government for losses in connection with the equipment. The Army made a shipment of 46 boxes on November 25, 1947, and of 266 boxes on December 10, 1947. The two shipments weighed 73,655 pounds, gross weight.

We now discuss the facts relative to the rights of the intervenors, the Khoongs. In September 1947, the Khoongs, then in China, made an offer by cable to purchase for $80,000 the 60 percent interest of Childers, Ranslow, Lee and Chang. We have said above that Childers and Ranslow each were given a 15 percent interest in the property. The Khoongs had also given Lee and Chang each a 15 percent interest, in return for their assistance to the Khoongs in borrowing the money which the Khoongs put into the deal. The offer was accepted and on October 23, 1947, a formal contract was made between Leyte Supply Corporation as seller, and Powell Khoong as buyer transferring "the entire property belonging to the sellers located at" the depot.

On October 30, 1947, a special meeting of the stockholders of the corporation was held in Manila. The Khoongs were not present, and Ranslow voted their stock by proxies. It was decided to liquidate the corporation. The minutes of the meeting recite that the corporation had been able to dispose of the supplies and equipment acquired by it. They make no mention of any exception as to the radar or any claim against the United States for the taking thereof. The stockholders voted to amend the cor-

porate charter so that it would expire on December 7, 1947, and to designate Edward Turney, the plaintiff herein, as liquidating trustee. In the enumeration of the liquidating trustee's powers there was a specific authorization as follows:

"To prosecute and defend any and all suits, actions, and other proceedings in the Courts, tribunals, departments and offices of the Government of the Republic of the Philippines and to compromise, settle and adjust the same and the subject-matter thereof;"

but there was no authorization to prosecute any suit, action, or other proceeding in this court or any other tribunal of the United States.

The Khoongs, as intervenors, assert that they bought the radar material from the corporation in whose shoes the plaintiff stands, before the Government took it, and that, therefore, the taking was from them and they alone are entitled to the compensation. The plaintiff asserts that the Government had taken the property before the sale to the Khoongs, and that, therefore, the claim against the Government resulting from the taking was not included in the sale of the property, and, indeed, could not have been lawfully assigned to the Khoongs even if that had been intended by the parties. He relies on 31 U.S.C.A. § 203, 35 Stat. 411, which invalidates assignments of claims against the Government.

The plaintiff also asserts that it was the intention of the parties to the sale from the corporation of the Khoongs that the radar and the claim against the Government in relation to it was not intended to be included in the sale. We consider first this latter assertion. There is a direct conflict in the evidence concerning the intention of the parties. Since the Commissioner of this court has resolved that conflict in favor of the intervenors, and we have reached a contrary conclusion, we discuss the evidence in some detail.

On behalf of the plaintiff, it was testified that the Khoongs were kept fully advised as to all the activities of the corporation, including the controversy with the Army concerning the radar. We believe this testimony. George Khoong, who, after the discovery of the radar, carried on the negotiations with the Chinese Air Forces for its sale to them, must have known why it was not possible to continue, or resume, that negotiation. Assuming that the negotiations had been broken off before the Army intervened, and for the reason that the asking price was too high, persons like the Khoongs would of course have tried again, since the Chinese Air Forces were their only potential customer for this material.

The Khoongs must have known of the embargo on the materials other than the radar, and the reason for it. It was in effect for more than a month, and must have greatly disrupted the deliveries on the sales which the Khoongs were making of materials other than the radar. We are unable to think of any reason why the Khoongs would not have been informed about it or why they would not have insisted on knowing the reason for the disruption of their business.

The Khoongs must have known that there was no prospect of getting the radar equipment back into the open market. After the events recited above, George Khoong made a week's visit to the corporation's headquarters and a two-day inspection trip to the depot during September 1947. The radar was at that time segregated and the corporation's written assurance that it would not be sold was in effect, as he must have known. No person of intelligence would have expected that anything would emerge from this sequestration, except a possible claim against the Government.

If the corporation intended to sell the radar equipment to the Khoongs, and the Khoongs intended to buy it, they both knew that the transaction was in direct violation of the written assurance which the corporation had given to both the Philippine and the American Government. We think that persons like the Khoongs, who were in the precarious

business of securing export licenses and finding approved purchasers in a war torn country, would have anticipated nothing but disaster from engaging in a transaction in violation of the assurances given. There is no slightest indication in the record that Ranslow and Childers, who acted for the corporation in the sale to the Khoongs, had any tendency to violate assurances given.

We think that the Khoongs did not regard the radar as an asset, but only as a potential source of trouble. Their wish was for the Army to take what it was going to take of the radar and clear out so that they could go on disposing of the other property. Whether in law the corporation was, at the time of the sale to the Khoongs, the owner of tangible property or of a lawsuit, in fact it had a troublesome controversy with a powerful adversary on its hands, and we think that the Khoongs at that time and in their circumstances would not have taken one end of that controversy as a gift. The radar, in view of the Army's attitude, was unsalable. A potential lawsuit, in a distant country, was not in the Khoongs' line of business.

In the agreement finally made between the corporation and the Army, dated November 11, 1947, and quoted in Finding 39, appeared this language:

"Every effort will be made to consummate this transaction without delay and prior to the turnover of the buildings at this location by the Leyte Supply Corporation to Powellsons."

The Powellsons were the Khoongs. We think that this language obviously inserted at the instance of the corporation, tends strongly to corroborate the oral testimony that the Khoongs' anxiety was to have the Army take its radar and get out before they took over what they had bought. This language was written shortly after the sale to the Khoongs. It has significance also in that the corporation was making no secret of its sale of the materials at the base to the Khoongs. If that sale had been regarded as transferring the radar equipment, and thus being in violation of the written assurances given two months before, both to the American Army and to the Philippine Government, it is unlikely that it would have been thus publicly disclosed.

The corporation's agreement of sale with the Khoongs contained the following provision:

"(5) If the sellers, for any reason whatsoever, cannot transfer the property under sale to the buyer by this agreement, the sellers hereby irrevocably agree to pay to the buyer US $20,000.—as penalty."

The corporation could not and did not transfer the radar equipment to the Khoongs yet the Khoongs never at any time claimed that this provision of the contract was applicable.

Ranslow and Childers testified that it was not the intention of the parties to include the radar equipment which was the subject of the controversy with the Army in the sale to the Khoongs. They testified in detail about the conversations with the Khoongs making the understanding plain. We have recited the circumstantial evidence which, we think, corroborates their testimony. We have also adverted to the three writings which tend to contradict it. The language of the contract of sale to the Khoongs, "the entire property" of the sellers located at the depot would, in the absence of an agreed contrary intent, have carried the radar equipment, assuming that it had not, at that time, yet been "taken" by the Government. But the property was in controversy, both parties knew that they would never be able to export or otherwise market it, and, regardless of its technical legal situation, practically it had become nothing more than a claim against the Army. This circumstance makes the language "the entire property" sufficiently equivocal to permit the showing of the actual intent of the parties.

The corporate minutes of the meeting at which the dissolution of the corporation was approved said that the corporation had been able to dispose of the sup-

plies and equipment acquired by it. No mention was made of the radar, or of any claim concerning it. The statement about the disposition of the property was true, as a practical matter, since all the property that the Army would not take would go to the Khoongs, and there would be no further necessity for the corporation, with whatever taxes or other burdens its continued existence might entail. The minutes also, as we have seen, specifically authorized the plaintiff, as liquidating trustee, to prosecute and defend suits in Philippine tribunals, but made no mention of a suit in this court or any tribunal of the United States. We do not know the reason for the omission. Whether there was some real or supposed merit, in Philippine law, in saying what was said, we do not know.

■ Our conclusion from all the pertinent evidence is that the sale from the corporation to the Khoongs was not intended to include and did not include the radar equipment which was repossessed by the United States.

■ The Government asserts that the surplus property sale at the Leyte Air Depot did not pass the ownership of the radar equipment to Ranslow and Childers. If it did not, the corporation never acquired title to it and the plaintiff can not recover. The Government relies on the directive of July 19, 1946, of the Pacific Air Service Command, relating to the declaration of property to be disposable surplus, which said:

"Under *no* condition will any radar equipment be declared to the disposal agency."

This directive was not disclosed to the public. The directive was violated, and the radar equipment here in question was, apparently inadvertently, declared surplus along with the other property at the Leyte Air Depot. In the contract of sale of the lot of property, the United States expressly disclaimed any responsibility as to what might turn out to be in the lot, but it warranted the title to the lot.

Section 25 of the Surplus Property Act of 1944, 50 U.S.C.A.Appendix, § 1634 said:

"A deed, bill of sale, lease, or other instrument executed by or on behalf of any Government agency purporting to transfer title or any other interest in property under this Act shall be conclusive evidence of compliance with the provisions of this Act insofar as title or other interest of any bona fide purchasers for value, or lessees, as the case may be, is concerned. 58 Stat. 780."

We have no doubt that title to the radar equipment passed to Ranslow and Childers. The statute just quoted shows that Congress was not willing to permit the disposition of surplus property to be handicapped by uncertainty as to whether Government agents exceeded their authority in treating it as disposable surplus. In United States v. Jones, 9 Cir., 176 F.2d 278, the court so held, and discussed at length the legislative intent.

■ If, then, Ranslow and Childers acquired the property, it passed to the corporation by their transfer. It was later repossessed by the Government. Our discussion above of the controversy between the plaintiff and the intervenors shows that, in our opinion, it was repossessed from the corporation in whose shoes the plaintiff stands. We now consider whether the repossession was a "taking," covered by the Fifth Amendment. We think that it was. The relations, at the time, between our Government and the Philippine Government, were close. Our armed forces had just liberated the Philippines from the Japanese. Our Government had given one hundred million dollars worth of surplus property to the Philippines, including the property at the Leyte Air Depot, and had sold the property for the account of the Philippine Government. When we requested that Government to place an embargo upon the exportation of any of the property, it, naturally, readily complied. That put irresistible pressure upon the corporation to come to terms with

the United States Army, the terms being that the radar equipment would be segregated in charge of the Army and would not be disposed of until a final agreement was reached as to its disposition. The final agreement turned the property back to the Army in exchange for a receipt, and with a reservation of the right to sue for its value. We think that the taking occurred on October 13, 1947, when the Army officially took possession of the property. The plaintiff is entitled to recover its fair value as of that date, with interest added as a part of just compensation.

The Government urges that the just compensation provision of the Fifth Amendment does not apply in foreign countries. The plaintiff points out that the Fifth Amendment has been applied to the taking of the property belonging to a resident alien and situated in the United States. Russian Volunteer Fleet v. United States, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473; and to the property, located abroad, of an American citizen. Wiggins v. United States, 3 Ct.Cl. 412. He urges that cases such as Ross v. McIntyre, 140 U.S. 453, 11 S.Ct. 897, 35 L. Ed. 581, in which it held that an American convicted by a consular court in Japan could not complain that he had been denied a constitutional right to trial by jury, do not mean that other constitutional rights, such as the right to just compensation for property taken, which can, without inconvenience or practical difficulty, be applied to a taking abroad, should not be so applied. There is no decision directly in point. We think the plaintiff's contention is sound.

We must determine the value of the property taken. The Commissioner of this court valued it at $1,120 per long ton, which value, applied to the 73,655 pounds of property taken, gave a total of $36,825.

Our Commissioner's figure of $1,120 per long ton was taken from the Pacific Air Service Command's directive of July 19, 1946, quoted in Finding 7. The directive said that "Noncombat bulk declarations will be made at $1,120 per long ton of supply." This was apparently a suggested price which the Foreign Liquidation Commission should try to get, in its sale of surplus property.

The plaintiff contends that the procurement or replacement value of the radar equipment, properly discounted, was its fair value. The procurement value was, apparently, the cost of the equipment to the Government, and was used by it in its internal accounting. In the case of pilferage, damage, or loss, the responsible person was charged with that value. That value, as to the equipment seized or rendered valueless by the seizure was $441,889.79. The plaintiff says that the corporation, in reselling all the property at the depot, tried to get 80 percent of the procurement value, sometimes getting more than that, and almost never got less than 50 percent of that value. It therefore takes the intermediate figure of 65 percent and claims $287,228.36 as the fair value.

The Government urges that the applicable classification under the directive of the Pacific Air Service Command, shown in Finding 7, is "demilitarized combat material" which was to be declared at 10 cents a pound. So computed, the value would be $7,365.50.

We think that the plaintiff's estimate of fair value is far too high. There was, apparently, an over supply of commercial type communications material in the area. This is shown by the corporation's refusal to exchange the radar equipment for the commercial type equipment on a ton for ton basis (See Finding 22) and its willingness to exchange for any other items except electronics equipment. There was no real prospect of a favorable sale of the radar equipment, after the embargo upon its exportation. We have, then, a situation in which property is of relatively small value to the owner, because its resale has been made impossible by the Government, but is of value to the Government, which is currently procuring such property at market prices. We recognize

that, generally speaking, it is the loss to the owner rather than the benefit to the taker that is controlling. If the Government had taken the property merely for the purpose of getting it back under its control in order to prevent it from falling into unauthorized hands, and had not received financial benefit from the taking, it might not be unfair to limit recovery strictly to the loss to the owner. In this case, the Government has not disclosed to us what it did with the things taken, and we may assume that it used or kept them for the same purpose for which it procured them in the first place. It, by instigating the embargo and by its other acts prevented the property from getting on the market. Then it took the property, and thereby relieved itself from having to buy similar property at market prices. We think the owner is, in such a unique situation, entitled to be compensated for some of the advantage which the Government has gained by first destroying the owner's market and then seizing the property.

█ Our conclusion is that, in the circumstances, just compensation for the property as of October 13, 1947, is $75,-000. The plaintiff may have a judgment for that sum and for interest at 4 percent from October 13, 1947, as a part of just compensation.

The petition of the intervenors is dismissed.

It is so ordered.

HOWELL and LITTLETON, Judges, concur.

JONES, Chief Judge (dissenting in part).

At the time the contract of sale was made neither the buyer nor the seller had any knowledge that radar equipment had been left in the Leyte Depot. Certainly the Government had no thought of declaring the forbidden radar equipment surplus property and subject to sale, and the purchaser had no thought of securing property, the sale of which was forbidden. There was therefore a mutual mistake of fact. Althoff Mfg. Co. v. Althoff, 52 Colo. 501, 123 P. 326.

In addition under applicable military regulations the radar equipment could not have been declared surplus, and the officials in charge had no authority to make a declaration of surplus that would include such equipment. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10.

We think the plaintiff should recover on a weight basis the average value of the non-military equipment located at the Leyte Air Depot. The Commissioner who heard the testimony found this value to be $36,825 at $1,120 per long ton. The evidence supports such a finding.

I would limit plaintiff's recovery to that amount.

WHITAKER, Judge, joins in this dissent.