**UNITED STATES of America, Plaintiff,**

v.

**Martin MAILET, Defendant.**

**Civ. A. No. 64–464.**

United States District Court
D. Massachusetts.

Dec. 31, 1968.

Paul F. Markham, U. S. Atty., O. S. Sughrue, Asst. U. S. Atty., Boston, Mass., Barry Blyveis, Department of Justice, Frauds Section, Washington, D. C., for plaintiff.

Loyd M. Starrett, Edwin A. Amidon, Jr., Foley, Hoag & Eliot, Boston, Mass., Archie Smith, Providence, R. I., for defendant.

## OPINION

JULIAN, District Judge.

This is an action for conversion of a roller bearing jaw rock crusher having an hourly capacity of between 70 and 100 tons of rock. The case is brought by the Government against a bona fide purchaser from a fraudulent vendee of government surplus materials. The parties submitted the case upon stipulated facts.

## FINDINGS OF FACT

On May 14, 1958, the plaintiff, United States of America (hereinafter the "Government"), issued an Invitation to Bid (Exh. A) offering for sale various items of surplus automotive and construction equipment located at the Naval Construction Battalion Center in Davis, Rhode Island (hereinafter the "Navy Base"). Among the items so offered, all of which were to be f. o. b. at the Navy Base, was a Model 1951 roller bearing jaw rock crusher manufactured by Pioneer Engineering Works in Minneapolis. The machine (hereinafter called the "crushing plant") was described as having an hourly capacity of 70 to 100 tons and as being "used" and in "poor" condition.

The bids were opened on June 10, 1958. Twenty-three bids had been submitted for the crushing plant, including an unsuccessful $25,000 bid by defendant Martin Mailet (hereinafter "Mailet"), who owned and operated a construction business in Salisbury, Massachusetts. The highest bid, in the amount of $29,900, was submitted on behalf of A. Forte & Sons, Inc. (hereinafter referred to as "Forte, Inc."), of Berkeley, Rhode Island, by its president, James A. Forte (hereinafter referred to as "Forte"), and was accepted by the Government (Exhs. B and C).

On that same day Mailet or one of his agents telephoned the Navy Base and learned that Forte, Inc., had been the successful bidder. Thereupon Mailet's wife, who was active in her husband's business, telephoned James A. Forte and inquired whether he would be interested in selling the crushing plant. As a result of that conversation, Mailet and Forte entered into an oral agreement whereby the Forte corporation agreed to sell the crushing plant for $35,000 to Mailet, who in turn agreed to make a $200 deposit pending the Navy's approval of the release of the crushing plant. Mailet paid the deposit two days later on June 12, 1958, on which date Forte signed a memorandum of the agreement (Exh. H).

In the meantime, on June 11, the Government issued to Forte, Inc., a "Notice of Award" advising it that its bid had been successful and that payment must be made within five days. The Notice of Award also stated that a "Notice of Release" would be forwarded to Forte when the goods were ready for delivery. Finally, the Notice of Award informed Forte, Inc., that

> "title to the property will vest in the purchaser only after payment and loading of the property has been completed."

That warning conformed to the provisions of the "General Sale Terms and Conditions" set forth in the Invitation to Bid (Exh. A), which provided that Forte, Inc., as purchaser was entitled to obtain the crushing plant upon the passing of title,[1] which would occur only after "full and final payment" and after the loading of the goods had been completed.[2]

The parties agree, and I therefore find, that, under the Government's standard equipment disposition procedures then in effect,[3] a Surplus Property Release Notice (Exh. F) should not have been issued until the Government had received full payment for the crushing plant.

In this case Forte, Inc., made no payment. Nevertheless, on or about June 11, 1958, the Government issued the "Surplus Property Release Notice" to Forte, Inc., which released the crushing plant for delivery and which required that the crushing plant be removed from the Navy Base by June 25, 1958. In addition, the Government issued a "Invoice/Shipping Document" (Exh. E) stating that the crushing plant was to be marked for and shipped to Forte, Inc.

During the following week Mailet's employees removed the entire crushing plant, in three stages, from the Navy Base and transported it to Mailet's place of business in Massachusetts. James A. Forte personally accompanied them to the Navy Base on the day the removal began and authorized Mailet's employees to remove the plant. All of the loading was done by Navy Base personnel using government equipment, including two Navy Base cranes. All of the transportation was performed by Mailet's employees using Mailet's trucks, except on June 17 when they were accompanied by two flatbed trucks hired, with drivers, by Forte, Inc., at Mailet's expense. Valid "Visitor's Passes" (Exh. J) were issued to each person and vehicle entering the Navy Base. Each truckload of parts which was removed was authorized to be removed by validly issued "Property Passes," (Exh. K) and Navy Base guards supervised and approved the entire removal process.

On each occasion when parts of the crushing plant were removed from the Base, standard heavy-equipment removal procedures were followed. The documents issued to Forte, Inc., comprised

---

1. Paragraph 7 of the "General Sale Terms and Conditions" provided, in pertinent part:
   > "*DELIVERY AND REMOVAL OF PROPERTY.*—The Purchaser shall be entitled to obtain the property upon vesting of title of the property in him, unless otherwise specified in the Invitation to Bid. * * *"

   The Invitation to Bid in this case did not specify otherwise.

2. Paragraph 6 of the "General Sale Terms and Conditions" provided, in pertinent part:
   > "*TITLE.*—Title to the items of property sold hereunder shall vest in the Purchaser as and when full and final payment is made, unless otherwise specified by the Government, and except that if the contract provides that loading will be performed by the Government, title shall not vest until such loading and such payment are completed. * * *"

3. Prior to rendering this opinion the Court ordered both parties to furnish the Court with citations to those statutes and regulations which established and governed the procedures to be followed by government employees in selling and releasing surplus property. The parties' responses indicate that the field is vague and confusing and that many applicable regulations are unpublished. The parties have suggested no authority which casts doubt upon the correctness of their stipulation.

all the documents which were issued in the ordinary course to any purchaser of surplus property, and were regular in form and fully completed.

Upon completion of the removal of the crushing plant, Mailet on June 19, 1958, paid Forte the balance of the agreed price, $34,800, and Forte, Inc., executed and delivered to Mailet a bill of sale.

Mailet acted in good faith throughout, and in purchasing the crushing plant from Forte, Inc., relied upon the Government's release of the plant and upon the documents issued by the Government. He did not know until about a year and a half later that Forte, Inc., had not paid for the plant, or that there had been irregularities in the transaction.

The only difficulty arose from the fact that, unbeknown to Mailet, Forte, Inc., had never paid the Government for the crushing plant. Forte, Inc., instead had obtained the premature issuance of the Surplus Property Release Notice by means of a fraudulent scheme participated in by the Government civilian employee charged with the responsibility for the whole transaction, one Donald J. Boisvert, who at all times pertinent to this case was assistant contracting officer, assistant sales contracting officer, and assistant property disposal officer. He was also supervisor of the surplus property disposal unit. His official title was Disposal Officer.

Boisvert's duties included contracting for the sale, transfer and disposal of surplus government property, collecting deposits and payments on bids and negotiated contracts, and authorizing payments, refunds and allowances. Under regulations then in effect he had continuous and complete responsibility for surplus material from time of receipt to time of disposal. In this case he issued every relevant document from the original bid itself to the Surplus Property Release Notice. The parties agree and the Court finds as a fact that, in an ordinary transaction of this type where fraud was not present and the buyer of surplus goods had in fact paid the full contract price, Boisvert as Disposal Officer was authorized by the Government to issue a Surplus Property Release Notice similar to that issued here.

A year and a half passed. On December 4, 1959, the Government brought suit against Forte, Inc., and James A. Forte in the United States District Court for the District of Rhode Island. The second amended complaint in that action contained two counts (Exh. R). In the first count the Government alleged a scheme to defraud the Government on the part of Forte, Inc., Forte, and Boisvert, covering a number of surplus property transactions during 1958 and 1959, including the transaction involving the crushing plant. Accordingly, the Government sought recovery under the Federal Property and Administration Services Act of 1949, 40 U.S.C. § 489, in the amount of $123,984.54, or twice the consideration agreed upon for all of the surplus property, in addition to recovery under the False Claims Act, 31 U.S.C. § 231, of double damages, forfeitures, interest and costs.

In the second count in the Rhode Island suit, the Government sued upon its contracts with Forte, Inc., to obtain the agreed purchase price for all of the surplus property described in the first count, including the crushing plant, for a total purchase price of $61,605.75.

Nearly four years later, following negotiations, Forte, Inc., and James A. Forte, the defendants in the Rhode Island action, and the Government concluded an agreement whereby among other things, upon a stipulation of the parties, judgment would be entered in the Rhode Island case in favor of the Government in an amount equal to that claimed in the complaint, namely, $185,-590.29. It was further agreed at that time that the Government would thereupon accept $66,000 in full settlement of that judgment and would duly acknowledge full satisfaction thereof. Such a stipulation for judgment was entered on October 21, 1963 (Exh. S), and was approved on that same date by Judge Day. Sometime thereafter Forte, Inc., and

Forte paid the Government $66,000, and the Government, on April 30, 1964, filed a satisfaction of the judgment with the Rhode Island court (Exh. T).

The Government's decision to enter into the agreement just described was based upon its own investigations and disclosures by Forte which indicated that Forte, Inc., and Forte were financially unable to pay any larger amount.

Mailet had no notice or knowledge that the Government challenged the validity of its transaction with Forte or that the Government claimed title to the crushing plant until approximately one and one-half years after his purchase from Forte, Inc., when he read about the Government's prosecution of Forte in the newspaper.

The fair market value of the crushing plant at the time Mailet removed it from the Navy Base was not less than $25,000 nor more than $35,000.

### CONCLUSIONS OF LAW

■ The essence of conversion is the exercise of a dominion or control over goods which is in fact inconsistent with the plaintiff's rights. The fact that Mailet acted in complete good faith in acquiring possession of the crushing plant is no defense if, in fact, the Government had title to the machine and was entitled to possession. Prosser, Law of Torts § 15, pp. 83, 94 (1964) and cases there cited.

■ Thus the outcome of this case must turn upon whether or not the Government has title in the crushing plant. The answer to that question, it is well established, depends upon federal rather than state law. United States v. Allegheny County, 1944, 322 U.S. 174, 182–183, 64 S.Ct. 908, 88 L.Ed. 1209; United States v. Jones, 1949, 9 Cir., 176 F.2d 278, 281.

The parties concede that the Government at the outset had both title and possession of the crushing plant. Forte, Inc., acquired no title whatever in June 1958, for its contract with the Government specified clearly that title would not vest in the purchaser until loading had been completed and "full and final payment" had been made. Title, at that point in time, remained with the Government. And, since Forte, Inc., had no title to transfer, Mailet, unless aided by the provisions of 40 U.S.C. § 484(d) (infra), became a converter upon his taking possession of the crushing plant, despite his status as a bona fide purchaser. Restatement (Second), Torts § 229 (1965), and cases cited in the appendix thereto; Prosser, supra, at 84.

Furthermore, because title did not vest in Forte, Inc., at least at that time, this case does not fall within the well-established rule that a bona fide purchaser for value from a wrongdoer who originally acquired his title from the true owner by fraud is not a converter. See Prosser, supra at 85, and cases cited; see also Restatement (Second), Torts § 229, comment d (1965).

The defendant maintains that he acquired title to the crushing plant when he purchased it from Forte, Inc. He argues that the title is guaranteed to him by the very statute regulating the disposition of surplus government property, 40 U.S.C. § 484(d):

> "A deed, bill of sale, lease, or other instrument executed by or on behalf of any executive agency purporting to transfer title or any other interest in surplus property under this subchapter shall be conclusive evidence of compliance with the provisions of this subchapter insofar as concerns title or other interest of any bona fide grantee or transferee for value and without notice of lack of such compliance."

That statute surely did not operate to vest title in Forte, Inc., which was not a bona fide purchaser for value and without notice. Whether a person in Mailet's position, however, qualifies as "any bona fide grantee or transferee for value and without notice" within the meaning of the statute seems never to have been decided.

One decision by the Court of Claims suggests that Mailet does so qualify, al-

though the initial purchaser from the Government in that case acted in good faith. Turney v. United States, 1953, 115 F.Supp. 457, 463, 126 Ct.Cl. 202. At the very least, an "urgent equity" suggests that persons in Mailet's position deserve protection, Dubin v. United States, 1961, 289 F.2d 651, 655, 153 Ct. Cl. 550, and serious questions arise whether the Congressional purpose of facilitating expeditious disposal of large quantities of surplus materials would not be defeated were Mailet denied the conclusive presumption created by the statute. See House Report No. 1757, 78th Cong., 2d Session, p. 17, quoted in United States v. Jones, 1949, 9 Cir., 176 F.2d 278, 290.

■ I hold that Mailet qualifies as a bona fide transferee for value and without notice within the meaning of 40 U.S. C. § 484(d) and that the statute conclusively establishes his title to the crushing plant. Had the Congress intended to limit the statutory presumption to first purchasers, there would have been no occasion for the insertion of the word "any." The language of United States v. Jones, supra, 176 F.2d at 289, is not inconsistent with this interpretation. A different interpretation, furthermore, would most probably impair the marketability of property which had once been government surplus, thus defeating the legislative purpose. Finally, the rule is fair, for the Government is far better situated and equipped than second or third purchasers to detect fraud or mistake committed by government agents vested with final authority to dispose of surplus property.

Therefore, by reason of the provisions of 40 U.S.C. § 484(d) the Government is not entitled to recover against Mailet.

There is a second alternative ground in support of the proposition that Mailet has acquired title to the crushing plant.

Title passed from the Government to Forte, Inc., as a result of the Rhode Island case (Exh. R) where the Government in Count Two sued Forte, Inc., and James A. Forte for the purchase price. The general rule of the common law of sales, both in England and America, prohibited an action by the seller for the purchase price unless title had passed. 2 Williston on Sales § 562, p. 1399 (2d ed. 1924) and cases there cited.[4] By suing for the purchase price rather than for rescission and return of the property, the seller elected to enforce the contract.[5] As Professor Williston observed,

"Of course, if the seller is entitled to the price, the buyer must be entitled to the goods. At what moment the title passes to him is not much discussed in the decisions, but the statement of the rule that the seller may store or retain the property for the buyer implies that when the seller deposits the goods with a third person for the buyer, or gives notice to the buyer by suing for the price or otherwise, that he himself is holding the goods for the buyer, either the title thereupon passes, or, what amounts to the same thing, the rights of the parties will subsequently be adjusted as if it had passed at that time." Williston, supra at 1402.

The same rule applied in the case of a conditional sale, where a seller relinquished possession of the property prior to receiving payment but retained title as a form of security for the price. If the seller sued for the purchase price, title passed to the buyer. Williston, supra §§ 571, 579. This principle was also recognized in Section 63(3) of the Uniform Sales Act, which empowered a seller who had retained the "property in the goods" to maintain an action for the price *if* he first tendered the goods to the buyer or held them as bailee for the buyer. Accord, Williston, supra § 560b.

---

4. Some American jurisdictions followed a different view in cases where the buyer's default lay in his rejecting title. 2 Williston on Sales §§ 562–563, pp. 1400–1402 (2d ed.1924).

5. Whether the seller sued in *assumpsit* for goods sold and delivered or simply for goods bargained and sold, the title in either event must have passed. 78 C.J.S. Sales § 439d, p. 58 and cases there cited.

Likewise, Section 2–709(2) of the Uniform Commercial Code, while permitting a seller to resell the goods if possible, requires a seller who sues for the price either to hold the goods for the buyer, or, at least, to credit the buyer with the net proceeds of any resale.

■ In short, the long-standing principle underlying the law of sales prohibits a seller who has sued and recovered judgment for the price from thereafter claiming title to the goods and seeking their recovery from the buyer. Accord, Vold, Law of Sales § 36, p. 215 (2d ed. 1959); see Jonesboro Compress Co. v. Mente & Co., Inc., 1934, 8 Cir., 72 F.2d 3, certiorari denied, 1934, 293 U.S. 618, 55 S.Ct. 210, 79 L.Ed. 707.

■ As between the Government and Forte, Inc., therefore, the recovery of the judgment in the Rhode Island case operated to transfer title in the crushing plant to Forte, Inc., and the Government was forever thereafter barred from seeking to recover the crushing plant from Forte, Inc.

When the Rhode Island judgment settled the status of the title as between the Government and Forte, Inc., furthermore, it also affected Mailet, who claimed title to the property as the purchaser of all of Forte's right and interest thereto.

"One who by purchase * * * has succeeded to an estate or interest, real or personal, is to that extent in privity with his predecessor in interest,

and is therefore entitled to the benefits * * * which by operation of final adjudication had attached to the property in the hands of its former owner."

Brown, Law of Personal Property § 20, p. 43 (2d ed. 1955), and authorities there cited in note 19.

■ A different result would have obtained had the Government proceeded against Forte, Inc., or James A. Forte, or both, not for the price but rather as converters, for an unsatisfied or partially satisfied judgment against one converter does not pass title to him nor bar the original owner from thereafter proceeding against a second converter. Lovejoy v. Murray, 1865, 70 U.S. (3 Wall.) 1, 16–17, 18 L.Ed. 129; United States v. Silliman, 1948, 3 Cir., 167 F.2d 607, 612–613; Brown, supra § 22, at p. 48; Ames, The Disseisin of Chattels, 3 Harv.L.Rev. 327–328 (1890). The Government, however, sued to recover the entire purchase price, and title, under the rule governing sales, passed upon the recovery of judgment.[6] The Government, therefore, is not entitled to recover against Mailet.

■■ There is a third basis for denying recovery to the Government. The general rule, with rare exceptions, is that the doctrine of estoppel does not operate against the Government. There are, of course, strong and sound reasons for such a rule.

---

6. Under 40 U.S.C. § 489(b)(2) and (d) there was no inconsistency in the Government's recovery of judgment under both Counts I and II in the Rhode Island action. The pertinent provisions of the cited section read as follows:

"* * * *

"(b) Every person who shall use or engage in * * * or enter into an agreement, combination, or conspiracy to use or engage in * * * any fraudulent trick, scheme, or device, for the purpose of securing or obtaining * * * for any person any * * * property * * * from the United States or any Federal agency in connection with the

* * * disposition of property under this chapter * * *.

"* * * *

"(2) shall, if the United States shall so elect, pay to the United States, as liquidated damages, a sum equal to twice the consideration agreed to be given * * * by such person to the United States or any Federal agency * * *.

"* * * *

"(d) The civil remedies provided in this section shall be in addition to all other criminal penalties and civil remedies provided by law."

The extraordinary facts of this case, however, require the making of an exception to the rule in order to prevent manifest injustice.

Mailet acted in complete good faith. He acted reasonably. He relied on government documents regular on their face issued by an official authorized to issue such documents. He had no reason to suspect that there had been anything improper in the transaction between the Government and Forte, Inc. On the contrary, he had every reason to believe that the transaction had been in all respects proper and that the Government had been paid for the crusher. In reliance on Government documents and acts, he paid Forte, Inc., full value for the crusher. The wrongful acts perpetrated by the government official were made possible by the clear lack of adequate administrative controls over the exercise by that official of the virtually unlimited powers vested in him in the disposal of surplus property.

The Government has recovered from Forte, Inc., and James A. Forte the sum of $66,000—an amount substantially equal to the price that Forte, Inc., had contracted to pay the Government for all the items of surplus property released to Forte, Inc., including the crusher, namely, $61,605.75, together with interest. (See Exh. R, Count II.) To permit the Government to recover in the present action would be tantamount to requiring Mailet, a person innocent of any wrongdoing, to pay a portion of the punitive damages adjudged against Forte, Inc., and James A. Forte under Count I of the Rhode Island action (Exh. R).[7]

In the circumstances of this case it appears to me unconscionable for the Government to press its claim against Mailet. This Court holds that the Government is estopped by its own conduct from recovering on its claim.

In view of my rulings it is unnecessary to consider the other arguments advanced by either party.

It is ordered that judgment be entered for the defendant.

---

7. The Government seeks here to appropriate Forte's $66,000 payment to the amount claimed in Count I of the Rhode Island case.

"The general doctrine is, that the debtor has a right, if he pleases, to make the appropriation of payments; if he omits it, the creditor may make it; if both omit it, the law will apply the payments, according to its own notions of justice. It is certainly too late for either party to claim a right to make an appropriation after the controversy has arisen, and *a fortiori*, at the time of the trial."
United States v. Kirkpatrick, 1824, 22 U.S. (9 Wheat.) 318, 326, 6 L.Ed. 199.