Fred E. LANGENEGGER, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 108–81L.

United States Claims Court.

May 14, 1984.

Michael B. Sheppard, Washington, D.C., with whom were Leva, Hawes, Symington, Martin & Oppenheimer, Washington, D.C., for plaintiffs.

James T. Draude, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant.

## OPINION

KOZINSKI, Chief Judge.

This unusual case presents the question whether the United States must compensate American landowners for the loss suffered when their land is expropriated by a foreign government pursuant to its land reform program.

### Facts

Plaintiffs are U.S. citizens each of whom owned an interest in Las Lahas, a large coffee plantation located in El Salvador. On October 15, 1979, a group of Salvadoran military officers ousted the country's existing government and established a "Revolutionary Junta of Government." The Junta declared its intent to enact a program of economic, political and social reforms, including agrarian reform. Despite significant social and political unrest, the Junta began implementing agrarian reform by adopting Decree No. 43 on December 7,

1979. This decree prohibited the transfer of agricultural lands in excess of 100 hectares.

On March 6, 1980, the government of El Salvador promulgated Decree No. 153, the Basic Law of Agrarian Reform, providing for the expropriation of large agricultural landholdings such as Las Lahas. Las Lahas was confiscated the next day. Decree No. 153 provided that owners of seized land would be compensated with long term bonds rather than with cash. Plaintiffs claim that the Salvadoran bonds are worthless and therefore that they have not received adequate compensation for the taking of their land.

Plaintiffs assert that the United States was responsible for the planning, implementation and financing of the Salvadoran agrarian reform program. Specifically, they claim that El Salvador's government was dependent upon the United States for survival and that the United States exerted intense pressure on El Salvador, causing the Junta to adopt the agrarian reform program embodied in Decree No. 153. They argue that the United States is responsible for the expropriation of Las Lahas, which served the foreign policy objectives of the United States. According to plaintiffs, this constitutes a taking of their property for public purposes requiring compensation pursuant to the fifth amendment. Plaintiffs also assert a right to compensation under the fifth amendment's due process clause and 22 U.S.C. § 2370(e)(1) (1982).

Defendant has moved for summary judgment.

## DISCUSSION

A. *The Fifth Amendment Taking Claim*

Plaintiffs' principal argument is that the United States took their property for a public purpose by persuading or prevailing upon the government of El Salvador to undertake the agrarian reform program that resulted in Decree No. 153 and the confiscation of Las Lahas. At issue is whether the actions allegedly taken by the United States can form a basis for recovery under the fifth amendment.

1. It is now well established that the United States is bound by the Constitution when it takes actions that affect the rights of its citizens, even if those actions are taken outside our country's territorial boundaries. *See Reid v. Covert,* 354 U.S. 1, 5, 77 S.Ct. 1222, 1224, 1 L.Ed.2d 1148 (1957). More specifically, the Court of Claims has held that the United States must provide compensation for the taking of property owned by American nationals, even though the property and the taking occurred abroad. *Seery v. United States,* 127 F.Supp. 601, 130 Ct.Cl. 481 (1955) (plaintiff's property in Austria used by U.S. Army as an officers' club). On the other hand, the Court of Claims has refused to hold the United States responsible where the actions constituting the taking were performed by a foreign government. *Huther v. United States,* 145 F.Supp. 916, 136 Ct.Cl. 655 (1956) (United States not liable where Canada constructed dam that caused flooding of plaintiffs' land). *Turney v. United States,* 115 F.Supp. 457, 126 Ct.Cl. 202 (1953), is particularly instructive in this regard. In that case, the United States enlisted the help of the Philippine government in efforts to recover classified military radar equipment that had mistakenly been sold to plaintiff. The court determined that the imposition of an embargo by the Philippine government prohibiting exportation of the radar effectively destroyed its value and put "irresistible pressure" on plaintiffs to return the radar to the United States. *Id.* 115 F.Supp. at 463, 126 Ct.Cl. at 214. Significantly, however, the court held that the taking by the United States only occurred on the date when the United States itself took possession of the radar. *Id.*

Even more significant, perhaps controlling, is *Anglo Chinese Shipping Co. v. United States,* 127 F.Supp. 553, 130 Ct.Cl. 361, *cert. denied,* 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955). That case involved the actions of General Douglas MacArthur in his capacity as Supreme Commander of the Allied Powers in post-World War II Japan. General MacArthur ordered the retention of plaintiff's vessel for use by the government of Japan in cable-laying operations. The court acknowledged that the Supreme Allied Commander was acting on behalf of the Allied Powers and therefore that any action taken by him was taken "as the agent of [each of the Allied powers, including the United States]." *Id.* 127 F.Supp. at 556, 130 Ct.Cl. at 366.

Nevertheless, the Court of Claims held that the United States was not liable because the vessel was taken and used for the benefit of Japan, not for the benefit of the Allied Powers. *Id.* 127 F.Supp. at 557, 130 Ct.Cl. at 367–68. In so holding, the court was unimpressed by the fact that General MacArthur, on behalf of the United States and the Allied Powers, may have "approved ... or even directed" Japan's activities. *Id.* 127 F.Supp. at 557, 130 Ct.Cl. at 368. The court also rejected the argument that there was a taking because the Allied Powers derived merely an incidental benefit from the seizure. Such an incidental benefit was deemed too remote to form the basis of a taking claim. *Id.* 127 F.Supp. at 557, 130 Ct.Cl. at 367.

■ When read together, these Court of Claims precedents squarely support the view that compensation under the fifth amendment will only be awarded where authorized agents of the United States participate in the taking and where the United States is the direct beneficiary thereof. Where the taking is accomplished by a foreign government, or where a foreign government is the principal beneficiary, the United States is not liable under the fifth amendment even if it participated in the foreign government's action or derived an incidental benefit therefrom. *See also De-Tom Enterprises, Inc. v. United States,* 552 F.2d 337, 213 Ct.Cl. 362, 364–65 (1977) (action of the United States in dissuading local government from adopting zoning change that could have been beneficial to plaintiff was not a taking); *cf. Custom Contemporary Homes, Inc. v. United States,* 5 Cl.Ct. 88 (1984) (federal participation in highway project does not render United States jointly liable for taking of property).

■ The seizure of Las Lahas was carried out by the government of El Salvador under a decree enacted in accordance with Salvadoran law.[1] Even if one accepts for

purposes of this motion all of plaintiffs' allegations about the degree of our government's involvement and influence in the domestic affairs of El Salvador, it would still be far less than the involvement of the Allied Powers in the operation of the Japanese government in *Anglo Chinese Shipping.* Moreover, plaintiffs do not allege that the United States received any direct interest in Las Lahas; they admit that the property was used exclusively by the government of El Salvador. Even if the court were persuaded that the United States derived certain collateral benefits from the Salvadoran land reform program, and consequently from the seizure of Las Lahas, those benefits are so remote as not to support a taking claim under the rationale of *Anglo Chinese Shipping.*

Plaintiffs nevertheless point to cases in other circuits holding that the United States may be responsible for the acts of foreign officials if U.S. agents were sufficiently involved in the activity to establish a joint venture between the two governments. *See, e.g., United States v. Hensel,* 699 F.2d 18, 25 (1st Cir.), *cert. denied,* 461 U.S. ——, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *Stonehill v. United States,* 405 F.2d 738, 743 (9th Cir.1968), *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969). It should first be noted that any inconsistency between these cases and the decisions of the Court of Claims must be resolved in favor of the Court of Claims precedents, which constitute controlling authority. General Order No. 1, 1 Cl.Ct. XXI (1982); *South Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982). In any event, these decisions are distinguishable.

The cases cited by plaintiffs involve situations where it was alleged that U.S. law enforcement officials collaborated with officials of foreign governments to obtain evidence by means which would have been prohibited in the United States by our Bill of Rights. The question arose whether

---

1. Plaintiffs have not challenged the taking of Las Lahas in the Salvadoran courts and have not explained their failure to do so. The court must therefore presume that the taking of Las Lahas conformed with Salvadoran law. *See De-Tom Enterprises, Inc.,* 552 F.2d at 338–339, 213 Ct.Cl. at 363–64.

such evidence ought to be suppressed in criminal proceedings conducted in our courts against the individuals from whom the evidence was obtained. In reaching their decisions the courts applied the well established joint venture doctrine.[2] That doctrine prohibits the United States from circumventing the exclusionary rule by collaborating with officials of another jurisdiction to accomplish indirectly what it cannot lawfully accomplish directly. *Hensel,* 699 F.2d at 25; *United States v. Emery,* 591 F.2d 1266, 1267 (9th Cir.1978); *Stonehill,* 405 F.2d at 743.

This line of cases represents a logical extension of the judicially-created exclusionary rule, a rule designed to maintain the integrity of our criminal proceedings by precluding the use of evidence that has been obtained in an unlawful manner. Given the special respect that our system of justice affords to criminal proceedings, and the perceived need to assure that prosecutors cut all corners squarely in securing convictions, it is understandable that evidence would be excluded when obtained by our law enforcement officers in a questionable or unlawful manner. Exclusion of the evidence in such cases is consistent with the theory of the Court of Claims cases discussed above. Where the United States introduces illegally seized evidence in a criminal trial, it derives an immediate and direct benefit from the unlawful conduct. As discussed earlier, however, the United States here has derived at best an incidental and indirect benefit from the seizure of Las Lahas. Thus the logic of the exclusionary rule cases does not extend to this case.

■ 2. Important considerations of judicial restraint provide an independent basis for refusing to recognize a cause of action on the basis of the facts alleged by plaintiffs. The crux of plaintiffs' case is that the United States exercised such con-

trol or influence over the government of El Salvador as to cause it to adopt the agrarian reform program. The case raises concerns about the competence of the judicial branch to resolve the issues presented, and poses the risk that by attempting to do so the court may impermissibly intrude into an area committed ,by the Constitution to the political branches of our government. *See Baker v. Carr,* 369 U.S. 186, 211–13, 82 S.Ct. 691, 706–708, 7 L.Ed.2d 663 (1962); *Shanghai Power Co. v. United States,* 4 Cl.Ct. 237, 247–49 (1983), *appeal docketed,* No. 84,860 (Fed.Cir. Feb. 28, 1984).

■ It is of paramount significance that the activities on which plaintiffs base their case go to the very heart of the the relationship between our government and that of El Salvador. In effect, plaintiffs claim to have been damaged by the manner in which the President, our Ambassador to El Salvador and other senior government officials conducted the foreign relations of the United States. The area of foreign relations is, of course, where our Constitution affords the broadest discretion to the President, *see United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 319–20, 57 S.Ct. 216, 220–221, 81 L.Ed. 255 (1936), and where involvement by the courts must be kept to a minimum. *See Ex parte Peru,* 318 U.S. 578, 588, 63 S.Ct. 793, 799, 87 L.Ed. 1014 (1943). The reasons for this are clear and have been noted repeatedly: In the area of foreign relations the nation must speak with a single voice, unencumbered by the diversity of opinion that is so characteristic of our system of government and our way of life. *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 706. Secrecy is often necessary for the President to successfully conduct our foreign affairs; intrusion into the process by other branches of the government may render it difficult or impossible to maintain the integrity of classified information. *Curtiss-Wright,*

2. The joint venture doctrine was developed in the context of cases involving collaboration between state and federal officials at a time when the exclusionary rule applied to federal but not to state criminal proceedings. Evidence provided to U.S. law enforcement officials by state or

local officials was suppressed if the federal officials were so involved in the search for the evidence "that the search in substance and effect was a joint operation of the local and federal officers." *Byars v. United States,* 273 U.S. 28, 33, 47 S.Ct. 248, 250, 71 L.Ed. 520 (1927).

299 U.S. at 320, 57 S.Ct. at 221. Our relationship with other nations frequently depends not only upon achieving substantive results but also upon safeguarding the honor, dignity and sensibilities of other sovereigns; exposing the process to judicial scrutiny may cause embarrassment to the President and to the sovereigns with whom he must deal. *Shanghai Power,* 4 Cl.Ct. at 248. Finally, but far from least important, the field of foreign relations frequently presents issues not capable of judicial resolution because there are no judicially manageable standards to apply. *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. 706.

■ These considerations counsel strongly against assertion of judicial authority in this case. Plaintiffs' proposed lawsuit would require the court to examine in considerable detail the relationship between our government and that of El Salvador at the very highest levels. This has already required access to classified documents. Additionally, the court granted plaintiffs' motion to depose senior State Department officials including the person who was our Ambassador to El Salvador when Las Lahas was expropriated. If the lawsuit were allowed to continue to the merits, it might well require the testimony of other present and past officials of our government, perhaps including President Carter, and also, quite conceivably, officials of the government of El Salvador. Indeed, while plaintiffs may be unable or unwilling to present the testimony of Salvadoran officials, defendant might well be placed in the position of needing their testimony to rebut or clarify evidence presented by plaintiffs. The possibility that our government will be embarrassed in the international sphere or

that classified information will be divulged is manifest.[3]

The litigation could embarrass relations between our country and El Salvador in other ways as well. Plaintiffs claim that the government of El Salvador undertook the agrarian reform program as a result of pressure from the United States and not because it considered this to be the best course of action for its people. In essence, plaintiffs are asserting that the United States meddled in the internal affairs of El Salvador and that the Salvadoran government permitted this to happen. A ruling by this court in favor of plaintiffs could be a serious affront to the dignity of El Salvador,[4] with an obvious impact on the delicate relations between the two governments.[5]

■ The President has the power to grant recognition to a foreign country and establish diplomatic relations with its government; the decision whether to do so is not subject to review by the judiciary. *United States v. Pink,* 315 U.S. 203, 229–30, 62 S.Ct. 552, 565–566, 86 L.Ed. 796 (1942). After the Revolutionary Junta of Government took over in El Salvador, our State Department promptly declared its intention to continue diplomatic relations. U.S. Department of State, *Digest of United States Practice in International Law* 127–28 (1979). By its actions, our government has taken the position that the new Salvadoran government had control over the territory and population of the country, and was capable of engaging in foreign relations with other nations as an independent sovereign. *See generally* Restatement (Second) of Foreign Relations Law of the United States §§ 4, 100, 101 (1965); 1 M. White-

---

**3.** While the classified documents in this case are held *in camera,* the court cannot minimize the possibility of inadvertent disclosure and the consequent danger to our security. While this concern ought not to preclude all lawsuits where classified information must be divulged, it is certainly a factor that must be considered in weighing the appropriateness of judicial involvement.

**4.** Even if the court's ruling were kept under seal, a judgment for plaintiffs could only be read as premised on such a finding.

**5.** As the Supreme Court has noted, "[t]o permit the validity of the acts of one sovereign State to be reexamined and perhaps condemned by the courts of another would very certainly 'imperil the amicable relations between governments and vex the peace of nations.'" *Oetjen v. Central Leather Co.,* 246 U.S. 297, 304, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918).

man, *Digest of International Law* § 14 (1963).

■ Plaintiffs' theory of what lay behind the enactment of Decree No. 153 is fundamentally at odds with the position taken by our government. Plaintiffs suggest—and would attempt to prove—that the government of El Salvador was not an independent sovereign after all, but conducted its internal affairs at the bidding of the United States. Under plaintiffs' theory of what happened, the United States and El Salvador dealt not as sovereign equals but as master and servant. An attempt to determine whether plaintiffs' view is correct would arrogate to the court the power to redefine our relationship with El Salvador.[6] This would be no less an intrusion upon the prerogatives of the President than that eschewed by the Supreme Court in *Pink*. 315 U.S. at 230, 62 S.Ct. at 565. So long as our government takes the position that El Salvador is an independent, sovereign state, the court must conclusively presume that the Salvadoran government acted on its own initiative to promote its country's best interests when it exercised the quintessentially sovereign power of making law. *See United States v. Belmont*, 301 U.S. 324, 328, 57 S.Ct. 758, 759, 81 L.Ed. 1134 (1937) ("who is the sovereign of a territory is not a judicial question, but one the determination of which by the political departments conclusively binds the courts").

Finally, pursuing the inquiry suggested by plaintiffs would take the court into an area devoid of the types of standards courts are equipped to apply. Plaintiffs' claim, once again, is that the United States exerted such influence over the government of El Salvador as to cause adoption of a land reform program that would otherwise not have been adopted. In resolving this dispute, the court would not only have to intimately examine the relationship between the two governments but also determine what El Salvador would have done had the United States not intervened. In essence, the court would be asked to guess how the Salvadoran government would have exercised its legislative powers. To appreciate the futility of this task one need only posit a lawsuit where the court is asked to determine what Congress would have done in 1980 if some particular circumstance had been different. A court is surely incapable of making that type of determination even in the domestic context. It would be entirely impossible, perhaps improper, for the court to determine what legislative judgment a foreign government would have made.[7]

Of course, not all actions of our government in the international arena are exempt from judicial scrutiny. The Supreme Court has urged courts to examine carefully each case in light of the applicable considerations. *Baker v. Carr*, 369 U.S. at 211–12, 82 S.Ct. at 706–707. Many cases that appear to involve sensitive matters of our foreign relations in fact turn out to be fully susceptible to resolution by the judiciary. *E.g., Ramirez de Arellano v. Weinberger*, 724 F.2d 143, 147 (D.C.Cir.1983) (plaintiff's allegation that the United States improper-

---

**6.** Indeed, plaintiffs go so far as to assert that the Salvadoran government was created by the United States, a proposition officially denied by our State Department. U.S. Department of State, *Digest of United States Practice in International Law* 128 (denial that "the United States had been connected with or involved indirectly in the coup, or had encouraged it in any way"). It would be highly improper for the court to second-guess the State Department's position on this issue.

**7.** Plaintiffs' lawsuit would raise other significant issues that the court is ill equipped to resolve. For example, a predicate of plaintiffs' claim is that they received no compensation for their

land from El Salvador. *See* p. 231 *supra*. Resolution of this issue would require the court to examine—and pass upon—the adequacy of El Salvador's compensation program. Quite aside from the potential slight to El Salvador, the inquiry would require the court to determine the value of foreign land, the effect of El Salvador's changed political situation upon that value, the value of the bonds plaintiffs received in exchange for the property, whether the Salvadoran government is likely to comply with the terms of the bonds or offer additional compensation, and whether the plaintiffs have any remedy under Salvadoran law if the compensation they receive proves to be inadequate.

ly used his property abroad did not present a nonjusticiable political question). Perhaps the clearest example of such cases are those involving the exclusionary rule, discussed above. *See,* p. 232 *supra.* Those cases do not implicate the foreign relations of the United States and present an issue—suppression of illegally seized evidence—that calls for the straightforward application of standards with which the judiciary is familiar.[8] By contrast, plaintiffs' lawsuit goes to the very heart of our diplomatic relations with a foreign government and raises issues not capable of judicial resolution. As the Chief Justice has stated in an analogous situation, "the needs of a system of government sometimes must outweigh the right of individuals to collect damages." *Nixon v. Fitzgerald,* 457 U.S. 731, 759, 102 S.Ct. 2690, 2706, 73 L.Ed.2d 349 (1982) (Burger, C.J., concurring).[9]

**B.** *The Other Claims*

**■** 1. Plaintiffs also claim that the involvement of the United States in the planning and implementation of El Salvador's land reform program constituted a waiver of their claim against El Salvador under international law. Plaintiffs argue that this waiver constituted a taking of that claim (as opposed to a taking of the property itself) and that such taking is subject to compensation under the fifth amendment.

Plaintiffs' waiver claim is premised upon the same factual showing as their claim that the United States took Las Lahas. For many of the reasons discussed above, the court must refrain from adjudicating the extent and nature of our government's involvement in El Salvador's decision to implement the agrarian reform program.

In addition, even if it were established that our government has waived or compromised plaintiffs' claim under international law, such action would not be a basis for compensation under the fifth amendment. *See Shanghai Power Co.,* 4 Cl.Ct. at 243–46.

**■** 2. Plaintiffs also argue that our government's actions constitute a violation of their rights under the due process clause of the fifth amendment. Quite aside from other considerations, our precedents establish that the due process clause cannot form the basis of a claim for money damages within the jurisdiction of this court. *See, e.g., Inupiat Community of the Arctic Slope v. United States,* 680 F.2d 122, 230 Ct.Cl. 647, 662, *cert. denied,* 459 U.S. 969, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982); *Walton v. United States,* 213 Ct.Cl. 755, 757 (1977); *Muehlen v. United States,* 529 F.2d 533, 209 Ct.Cl. 690 (1976).

**■** 3. Finally, plaintiffs seek to recover under 22 U.S.C. § 2370(e)(1) (1982), which requires the President to suspend assistance to any country that seizes the property of American citizens without providing compensation for the seizure. Section 2370(e)(1) is simply a directive to the President to take certain action, it does not mandate the payment of money. The court therefore lacks jurisdiction over plaintiffs' claim. *See United States v. Mitchell,* 463 U.S. ——, ——, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983); *cf. Aerotrade, Inc. v. Agency for International Development, Dep't of State,* 387 F.Supp. 974, 976 (D.D.C.1974) (court lacks jurisdiction to compel President's compliance with section 2370(e)(1)).

---

**8.** *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144 (D.D.C.1976), upon which plaintiffs rely, is distinguishable on similar grounds. Like the exclusionary rule cases, *Berlin Democratic Club* involved dealings of officials at relatively low levels. The case did not implicate the actions of the President, the conduct of our foreign relations or the legislative powers of a foreign government.

**9.** One commentator has suggested that the existence of a judicial remedy for actions taken by

our foreign policy officials unduly burdens the conduct of our foreign relations because of the "restraining effect of legal and budgetary forces within the bureaucratic process." Trimble, *Foreign Policy Frustrated*—Dames & Moore, *Claims Court Jurisdiction and a New Raid on the Treasury,* 84 Col.L.Rev. 317, 375 (1984). In this commentator's view, persons who suffer as a result of our foreign relations ought to be relegated to the political arena, the traditional forum for resolving such issues. *Id.* at 382.

### Conclusion

Defendant's motion for summary judgment is granted. The clerk is directed to dismiss the complaint and award costs to the prevailing party. 28 U.S.C. § 2412(a) (1982); RUSCC 54(d).